[Crim. No. 20936. Nov. 9, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT G. BLAIR, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, and Donald L. A. Kerson, Deputy State Public Defender, for Defendant and Appellant.

Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz, Fred Okrand, Mark D. Rosenbaum, Terry Smerling and Robert Florey III as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Michael Nash, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MOSK, J.**—We held in *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238 [118 Cal.Rptr. 166, 529 P.2d 590], that a depositor's bank statements provided to the police by the bank without the benefit of legal process were obtained as the result of an illegal search and seizure, in violation of article I, section 13 of the California Constitution.[1] In this case we are called upon to decide, inter alia, whether the rationale of *Burrows* applies to copies of bills charged to a credit card used by defendant, to the record of a telephone call made by him from a hotel room in California, and to telephone records of an associate of defendant in Philadelphia, obtained by federal authorities in that city and provided by them to the police in California.

Defendant was convicted of the murders of Alan and Renate Wellman, which occurred at their home in Los Angeles on the night of December 14, 1975. He appeals from the judgment of conviction.

On August 12, 1975, Wellman, a lawyer, appeared before a federal grand jury in Philadelphia regarding a stolen treasury bill. He testified that he had met defendant socially, that defendant had asked him to negotiate a $50,000 treasury bill, and he agreed to do so for a fee of $500. When he attempted to cash the note, the bank notified him that it had been stolen. He advised defendant to protest the bank's claim, but defendant did not do so.

In October 1975, defendant was indicted for selling or receiving the note, and a trial date of November 19, 1975, was set, which was continued to January 12, 1976, at the request of defendant's attorney. Wellman had been subpoenaed to appear at the trial.

Defendant had been convicted in 1970 on a charge involving stolen federal securities and was on parole for that conviction at the time of the grand jury proceedings. If convicted on the 1975 charge he could have received a maximum of 10 years in prison in addition to the time remaining to be served on his parole term. One month after the Wellmans were murdered, the United States Attorney in Philadelphia moved to dismiss the case against defendant because Wellman was the only witness to the charge.

---

[1]Article I, section 13 provides in part, "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated;..."

The Wellmans lived on Scadlock Lane in Los Angeles. They were found by their daughter on the afternoon of December 15, dressed in their bathrobes, lying face down on the floor, with pillows over their heads. They had been killed some time between 7 and 10 p.m. on the night of December 14 by gunshot wounds from a Colt Cobra .38 handgun, which was in the front room. They had apparently been preparing for bed at the time of the murders; the condition of the house indicated that robbery was not the motive.

On December 14, between 9 and 9:30 p.m., defendant entered the motel office of Rocky Stroud in Encino, and asked directions to Scadlock Lane.[2] Stroud pointed the way on a street map in the motel office. A neighbor of the Wellmans, returning home about 11 p.m. on December 14, noticed two black men walking from the front porch of the Wellman house; they drove off in an older model white car. She testified that she was not alarmed because it was commonplace to see blacks entering and leaving the Wellman residence.

Suspicion focused upon defendant almost immediately. Defendant, who sometimes used the name Robert Bartee,[3] maintained a residence in Philadelphia, and an office under the name of Step Ahead Enterprises, which employed one Betty Elaine Vineyard. The Federal Bureau of Investigation in Philadelphia was aware of defendant's connection with Vineyard and Step Ahead Enterprises. The United States Attorney, who was conducting an obstruction of justice investigation in connection with the Wellman murders, obtained permission of the grand jury in Philadelphia to subpoena defendant's telephone records and those of his associates. Although not entirely clear, the investigation was apparently conducted under the auspices of the grand jury.[4] An agent of the Federal Bureau of Investigation, who was assisting the United States Attorney, sought and received permission from the latter to subpoena the records of calls made to and from Vineyard's telephone. The subpoena, served upon the Bell Telephone Company of

---

[2]One of defendant's major contentions, discussed *infra,* is that Stroud's identification of him was unreliable.

[3]In this opinion, when appropriate, defendant will be referred to as Bartee.

[4]The United States Attorney testified that after the murders, he informed the grand jury that the indictment must be dismissed because the government's primary witness had been murdered. He then told the grand jury, "we are going to institute an obstruction of justice investigation" and "subpoena telephone records of Mr. Blair and any known associates that he had," and that the grand jury concurred in this procedure.

Philadelphia, was filled in by an employee of the Federal Bureau of Investigation and made returnable either to the grand jury or to that agency. The records were supplied by the telephone company to the Federal Bureau of Investigation rather than to the grand jury. They indicated that the Vineyard telephone was charged for calls to a certain Oakland number on December 12 and 14 and a Los Angeles number on December 15.[5]

The authorities in Philadelphia provided Los Angeles police with the California telephone numbers shown on Vineyuard's records, and the police determined that the Oakland number was that of the Edgewater Hyatt House Hotel (hereinafter Hyatt House) and the Los Angeles number was the Marriott Hotel. They examined the registers of these hotels and found that a Robert Bartee and two others had checked into two rooms at the Hyatt House on December 11, 1975, and departed on December 14, and that Bartee and his party were at the Marriott on the night of December 14, checking out early in the morning of December 15. At the request of the police, an employee of the Hyatt House showed the police a list of telephone calls charged to Bartee's account by the hotel. Among them was one at 4:17 p.m. on December 14 to the Wellman home in Los Angeles.

Credit cards had been issued to Robert Bartee by Diner's Club, American Express, and Carte Blanche. The police, by informal inquiries and without obtaining search warrants or subpoenas, requested and received from American Express a copy of Bartee's credit card application, and from Carte Blanche information as to the amount he owed. An employee of Diner's Club informed the police that a TWA airline ticket had been charged to the card, and gave them the ticket number, but declined to provide further information without a subpoena. Subpoenas were issued to the credit card companies for information regarding Bartee's accounts, returnable at the preliminary hearing on June 14, 1976.[6] Diner's Club, instead of waiting to offer the documents at the preliminary hearing, turned them over to the prosecution on June

[5]Similar information was revealed by telephone records subpoenaed from the Chesapeake and Potomac Telephone Company in Baltimore, where defendant also maintained a residence and used a telephone listed in the name of Janet Elizabeth Bartee.

[6]Although the record does not indicate the circumstances under which the subpoenas were issued, presumably they were filled out by a clerk, the district attorney, or his investigator, as authorized by section 1326 of the Penal Code. That section provides that a subpoena may be issued by the clerk of the court in which the action is to be tried, the district attorney, or his investigator, among others.

11. Among them was "a listing of the establishments at which the card was used."[7] The information revealed that the Bartee card was used to pay for lodging and other expenses at the Hyatt House in Oakland between December 11 and December 14, 1975, and at the Marriott Hotel in Los Angeles on the night of December 14, as well as for three tickets on a flight from Los Angeles to Baltimore on December 15.

When a Federal Bureau of Investigation agent conducted an interview on December 19 in Philadelphia, defendant denied that he knew the Wellmans. On December 23, defendant, without having been summoned, visited his parole officer in Philadelphia, denied that he was involved in the Wellman murders, and displayed to the officer a letter purporting to set forth in detail his whereabouts in the Philadelphia area on the weekend of the murders. Defendant retained the letter. Thereafter, in a search of the Vineyard residence for narcotics made under the authority of a warrant, a Philadelphia homicide officer assigned to investigate the Wellman murders found the letter in Vineyard's bureau drawer in which a quantity of narcotics was also discovered.

Defendant testified at the trial, offering an alibi as his primary defense. He testified as follows: he is a narcotics dealer and made frequent trips to Oakland and Los Angeles for the purpose of purchasing narcotics. Between December 11 and 14 he was in Oakland with two associates to buy heroin, and after they successfully completed the purchase, they left for Los Angeles on December 14.

His supplier of cocaine was Wellman from whom he had bought cocaine in the past. On December 14, he called Wellman from Oakland for the purpose of arranging a purchase of cocaine. When he arrived in Los Angeles, he rented a Ford Thunderbird from Avis. He then called Wellman from a pay telephone about 8:30 p.m. and arranged to meet Renate Wellman on the corner of Sepulveda and Valley Vista streets at 9:15 p.m. He did not stop at the Stroud motel on the way to the meeting place. Shortly after defendant arrived at Sepulveda and Valley

[7]The information provided by Diner's Club was as follows: "...a copy of the employment verification, credit investigation, the work cards that detailed some of the transactions on the card, the lost-stolen report [defendant had reported to Diner's Club that his card had been stolen], a copy of the telegram notifying cancellation report, a copy showing the pick-up of the credit card, authorization advices dealing with credit authorizations for specific transactions on the account, a copy of the billing dated 1/16/76, the charges associated therewith...and a listing of the establishments at which the card was used."

Vista, Renate Wellman drove up in a red Volkswagen with a Rolls Royce grille. He gave her $10,000 in cash for a half pound of cocaine. The rented Thunderbird failed to start after the transaction, and she drove him back to the Marriott Hotel, dropping him off there about 10:20 p.m. He denied that he had murdered the Wellmans, and testified that he bore no grudge against Wellman for his testimony before the grand jury.

The Department of Motor Vehicles had no record of a red Volkswagen registered to the Wellmans, and no report of a mechanical failure had been filed with Avis regarding the Ford Thunderbird. There was evidence that Wellman used cocaine and that he had said shortly before the murders that he "was coming into a large sum of money the first of the week." The gun used in the murders was stolen on June 27, 1975, from a police officer in Haddenfield, a New Jersey town 10 miles from Philadelphia.

Defendant pleaded not guilty to two counts of first degree murder. He made a motion to suppress the identification testimony of Stroud, and moved under Penal Code section 1538.5 to suppress the documents revealing the telephone calls made to and from Vineyard's telephone in Philadelphia, the call made from the Hyatt House to the Wellman telephone, and the charges defendant made on his Diner's Club card, as well as the letter written by him to his parole officer. The motion was denied. In a first trial, the jury was unable to reach a verdict and a mistrial was declared. Defendant moved to dismiss the charges in the interest of justice. After the motion was denied, a second trial was held which, after three days of jury deliberations, resulted in a verdict of guilty of murder in the first degree on both counts.

I

We consider, first, whether the trial court properly denied the motion to suppress the information regarding the charges made on defendant's Diner's Club card.[8] As we have seen, Diner's Club, after having been

---

[8]While the motion to suppress covered the information obtained from American Express and Carte Blanche as well, the only matters disclosed to the police by these companies without legal process were a copy of a credit card application, Bartee's address, and the amount he owed. The effect of this information upon the case against defendant is so peripheral that we do not discuss the propriety of providing this data to the police without legal process.

served with a subpoena returnable before the court at defendant's preliminary hearing on June 14, 1976, instead provided to the prosecuting attorney on June 11 documents concerning Bartee's account, including records of charges made by him with the card. █ The issuance of a subpoena duces tecum pursuant to section 1326 of the Penal Code (see fn. 6 *ante*, p. 648) is purely a ministerial act and does not constitute legal process in the sense that it entitles the person on whose behalf it is issued to obtain access to the records described therein until a judicial determination has been made that the person is legally entitled to receive them. (*Carlson* v. *Superior Court* (1976) 58 Cal.App.3d 13, 21-23 [129 Cal.Rptr. 650].)[9] Indeed, the People concede that the information was provided without legal process. Thus, if, as we shall conclude, the rationale of *Burrows* applies to the records of the credit card charges made by defendant, the prosecution did not lawfully obtain those records.

In *Burrows*, we held that a bank customer has a reasonable expectation of privacy in the checks which he transmits to the bank in the course of business, and the bank statements which summarize the information revealed thereby, and he expects that absent compulsory legal process, the matters he reveals to the bank will be used by it only for internal banking purposes. The prosecution unreasonably interfered with this expectation by revealing, pursuant to an informal inquiry by the police, information regarding details of defendant's accounts. The character, scope, and relevancy of the material obtained was thus determined entirely in the unbridled discretion of the police. (Also see *Commonwealth* v. *DeJohn* (1979)—Pa.—[403 A.2d 1283, 1289-1290].)

We pointed out that for all practical purposes, the disclosure of an individual's financial affairs to a bank is not entirely volitional because it is impossible to participate in modern economic life without maintaining a bank account, that in the course of such dealings a depositor reveals many aspects of his personal affairs, opinions, habits and associations so that bank records provide "a virtual current biography." To allow the police access to such records and other financial information provided by a customer to his bank would open the door to a vast range

---

[9] In *Carlson*, as here, the person to whom the subpoena was addressed provided the documents called for in the subpoena (bank records) to law enforcement officials before the return date upon which they were ordered to be produced in court. It was held that this procedure did not comply with *Burrows* because the records could not legally be turned over to prosecution officials without a judicial determination that they were entitled to them.

of abuses by the state. We recognized, however, that if the bank is not neutral in the matter as for example, where it is itself a victim of the depositor's alleged wrongdoing—the accused's right of privacy will not prevail.

■ The rationale of *Burrows* applies in a comparable manner to information regarding charges made by a credit card holder. As with bank statements, a person who uses a credit card may reveal his habits, his opinions, his tastes, and political views, as well as his movements and financial affairs. No less than a bank statement, the charges made on a credit card may provide "a virtual current biography" of an individual. (*Burrows*, 13 Cal.3d at p. 247.)

A credit card holder would reasonably expect that the information about him disclosed by those charges will be kept confidential unless disclosure is compelled by legal process. The pervasive use of credit cards for an ever-expanding variety of purposes—business, social, personal, familial—and the intimate nature of the information revealed by the charges amply justify this conclusion.[10]

Nor can there be any doubt that, as in *Burrows*, the scope of the search was unreasonable. The documents provided to the prosecution constituted virtually the entire file of the Diner's Club relating to defendant's account.

The People seek to justify this significant intrusion into defendant's privacy upon two grounds. They claim, first, that Diner's Club was not a neutral party because defendant had obtained the card under an assumed name and therefore the case comes within the exception to the rule referred to in *Burrows*. This reasoning is flawed under the circumstances of the present case. Diner's Club obviously did not view itself as the "victim" of defendant's conduct: after informing the police regarding one charge on the account, it refused to provide any further information unless compelled to do so by subpoena. It is noteworthy also that a representative of American Express testified at the suppression hearing that the fact a customer obtains a card under a fictitious name would not cause the company to cancel the account. Use of fictitious names is not illegal in California unless employed for a fraudulent purpose or in violation of a statute. (See, e.g., Pen. Code, § 12076.)

---

[10]According to defendant, there are over 500 million cards in use, representing annual charges of $120 billion.

The second reason offered by the prosecution for upholding the search is that only lending institutions are prohibited by the California Right to Privacy Act (Gov. Code, § 7460 et seq.) from disclosing financial information about their customers without the safeguards set forth in the act, and that the act specifically allows a state or local agency to obtain credit reports from other types of financial institutions. We need point out only that the information obtained by the prosecution from the Diner's Club cannot be characterized as a credit report. In any event, the rule laid down in *Burrows* is based upon constitutional precepts. The mere fact that a statute does not regulate the circumstances under which a credit card company may furnish information regarding a customer to the police cannot be deemed controlling; the absence of a statute prohibiting disclosure of a customer's bank records at the time *Burrows* was decided did not deter us from invoking constitutional protection for such information and preventing disclosure at the informal request of the police.

## II

We next consider whether the police acted improperly in obtaining from an employee of the Hyatt House, without legal process, a list of telephone calls made from defendant's room while a guest at the hotel. Among those calls was one to Wellman on the day of the murders.

In *People* v. *McKunes* (1975) 51 Cal.App.3d 487 [124 Cal.Rptr. 126], it was held, under the authority of *Burrows*, that the police may not, without legal process, obtain from the telephone company records revealing the calls dialed by a defendant from his home or office. The court reasoned that, as with bank records, a telephone subscriber has a reasonable expectation that the calls he makes will be utilized only for the accounting functions of the telephone company and that he cannot anticipate that his personal life, as disclosed by the calls he makes and receives, will be disclosed to outsiders without legal process. As with bank records, concluded the court, it is virtually impossible for an individual or business entity to function in the modern economy without a telephone, and a record of telephone calls also provides "a virtual current biography."

The fact that the telephone calls in the present case were made by defendant from a hotel room rather than his home does not render the *McKunes* rationale inapplicable. As in the case of a telephone call from

a private residence, a hotel guest may reasonably expect that the calls which he makes from his room are recorded by the hotel for billing purposes only, and that the record of his calls will not be transmitted to others without legal process. The People argue that because there is no "ongoing relationship" between a hotel and a guest who rents a room for a limited period, the situation is distinguishable from *McKunes* and *Burrows*. But the hotel room is in reality a residence, however temporary. Thus the critical issue is whether there is an expectation of privacy in the information sought; such an expectation may exist even in the briefest encounter between the persons who impart and receive the information. We conclude, therefore, that the motion to suppress should have been granted as to the telephone call which defendant made from the Hyatt House to Wellman on December 14.

■ Another seizure of telephone records is also in issue. Defendant urges that the record of telephone calls made to and from Vineyard's telephone in Philadelphia obtained by federal agents from the Bell Telephone Company in that city was improperly admitted at trial. He contends that even if the seizure of the records was legal under federal and Pennsylvania law, if it had occurred in California it would have been illegal under *Burrows* and *McKunes*, and therefore the evidence should have been suppressed.

In *Smith* v. *Maryland* (1979) 442 U.S. 735 [61 L.Ed.2d 220, 99 S.Ct. 2577], the United States Supreme Court held that a telephone subscriber does not have federal constitutional protection in the numbers which he dials from a home telephone, the numbers being obtained from a pen register installed by the telephone company at the request of the police in the offices of the company.[11] We can perceive no distinction between *Smith* and the present case. Although the information obtained by the police here consisted of billing records indicating the calls charged to Vineyard's telephone, the holding of *Smith* compels the conclusion that the police did not violate the Fourth Amendment by obtaining the records in question without a warrant.

Even though the seizures were proper under federal law, the question remains whether the manner in which the records were obtained would have violated California law if the seizures had occurred in this state, and if so, whether they should have been excluded. The People contend

[11]A pen register is a mechanical device which records the numbers dialed from a telephone, but it does not overhear oral communications or indicate whether the call was completed.

that because the records were produced pursuant to a subpoena, they were obtained by legal process, and therefore there was no violation of either *Burrows* or *McKunes*. As we have seen, an agent of the Federal Bureau of Investigation issued the subpoena under the authority of the United States Attorney, who was in turn authorized to do so by the grand jury. The subpoena was made returnable before either the grand jury or an agent of the Federal Bureau of Investigation and the documents were delivered by the telephone company to the agent.

Such a procedure would have rendered the telephone records inadmissible in evidence in this state. For the same reasons which impelled us to conclude above that the mere issuance of a subpoena duces tecum by law enforcement officials did not entitle them to obtain the records of defendant's credit card transactions, we hold that the prosecution would not have been entitled to the telephone records if they had been produced pursuant to a subpoena issued by a California grand jury, without a judicial determination that law enforcement officials were entitled thereto. We have recognized that the prosecution "is typically in complete control of the total process in the grand jury room" and that the grand jury is "independent only in the sense that it is not formally attached to the prosecutor's office." (*Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, at p. 589 [150 Cal.Rptr. 435, 586 P.2d 916].) Thus, we have no doubt that Vineyard's telephone records could not have been introduced into evidence in California if they had been seized here under circumstances similar to those which occurred in Philadelphia.

The question at issue in this aspect of the case is, therefore, whether the trial court should have excluded the telephone records on the ground that, although they had been legally seized under federal law and under the law of Pennsylvania, the seizure would have violated article I, section 13, of the California Constitution if it had occurred in this state.

From the inception of the exclusionary rule, we have made it clear that the rule has a two-fold purpose: To deter the police from engaging in unconstitutional searches and seizures by removing their incentive to do so, and to relieve the courts from being compelled to participate in illegal conduct. (See, e.g., *People* v. *Cahan* (1955) 44 Cal.2d 434, 445-446 [282 P.2d 905, 50 A.L.R.2d 513]; *Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150, 156-157 [98 Cal.Rptr. 649, 491 P.2d 1]; *People* v. *Disbrow* (1976) 16 Cal.3d 101, 113 [127 Cal.Rptr. 360, 545 P.2d 272].)

The first of these goals would obviously not be served by exclusion of the evidence in question, for no California law enforcement personnel participated in the seizure of the records from the telephone company in Philadelphia, and since the seizure was not illegal where it occurred, exclusion would serve no deterrent effect in either jurisdiction.

The question remains, however, whether the vindication of judicial integrity requires exclusion. The rationale underlying this basis for the rule, as explained in *Cahan,* is that it is morally incongruous for the state to flout constitutional rights and at the same time demand that its citizens obey the law, that government teaches by example, and that if the government becomes a law-breaker, its action breeds contempt for the law. The "success of the lawless venture depends entirely on the court's lending its aid by allowing the evidence to be introduced. . . . Out of regard for its own dignity as an agency of justice and custodian of liberty the court should not have a hand in such 'dirty business.'" (*Cahan,* 44 Cal.2d at p. 445.)

Defendant urges that judicial integrity is compromised in this circumstance so as to outweigh the state's interest in the successful prosecution of crimes committed in this state. We write upon a clean slate, for no direct authority regarding this issue has been cited or found.[12] Reflecting upon the alternatives, we conclude that the principles of *Burrows* and *McKunes* were not violated by admission of Vineyard's telephone records at defendant's trial. Defendant was a resident of the jurisdiction in which the seizure occurred. Since the search was legal there, his expectation of privacy was not impaired under the laws of the state in which he resided. Unlike the situation that arises when a seizure contrary to California law occurs in this state, the venture is not lawless, and the government is therefore not profiting from illegal conduct or acting as a law-breaker.

---

[12]*People* v. *Orlosky* (1974) 40 Cal.App.3d 935 [115 Cal.Rptr. 598], considered the converse of this situation. There, a seizure occurred in Indiana, illegal under the laws of that state but legal if it had been made in California. The court concluded that the evidence was admissible in a California trial. It determined that the "judicial integrity" rationale would lead to admissibility of the evidence in California since the police conduct would have been proper under California law. On the question of deterrence, the court determined that California's interest in successfully prosecuting crime was not outweighed by Indiana's interest in disciplining its own police since Indiana could control its officers adequately by applying its rules in prosecutions in that state.

Two law review commentaries discuss the application of the exclusionary rule in the circumstances present here. One author concludes that it is unlikely that a court would exclude the evidence "unless it places heavy reliance on an exacting notion of judicial integrity." (Theis, *Choice of Law and the Administration of the Exclusionary Rule in*

Defendant claims also that the trial court erred in refusing to suppress the letter written by him to his parole officer. He argues that the warrant to search Vineyard's home was issued for the purpose of determining whether she possessed narcotics, and the fact a Philadelphia police officer who was investigating the Wellman murders accompanied the narcotics officers on the search demonstrates that it was not made "in good faith for the purpose of discovering the objects specified in the warrant." (*United States* v. *Tranquillo* (M.D.Fla. 1971) 330 F.Supp. 871, 875.) The investigator testified that he had accompanied the narcotics officers to look for evidence of the homicide, but in a later portion of his testimony he stated that he went along to look for narcotics and to talk to Vineyard about the homicide investigation.

Defendant admits that the narcotics officers could have seized the letter if they had known of its connection with the homicide investigation (*People* v. *Hill* (1974) 12 Cal.3d 731, 758 [117 Cal.Rptr. 393, 528 P.2d 1] [overruled on other grounds in *People* v. *DeVaughn* (1977) 18 Cal.3d 889, at fn. 5, p. 896 (135 Cal.Rptr. 786, 558 P.2d 872)].) The search did not exceed the scope allowed by the warrant; the narcotics were found in a bureau drawer which also contained the letter.

While the homicide investigator's testimony raises some doubt as to his purpose for participating in the search, we need not undertake a detailed analysis of defendant's claim since it is inconceivable that any error in admission of the letter could have been prejudicial. The primary importance of the letter in the case against defendant was that it demonstrated a consciousness of guilt and reflected upon his credibility. The details of his whereabouts as stated in the letter were unimportant relative to this purpose. Defendant's parole officer spoke with a Federal Bureau of Investigation agent shortly after the letter was presented to him and told the agent that it contained a summary of defendant's whereabouts in Philadelphia on the weekend of the murders. The parole officer testified to the same effect at both the suppression hearing and the trial. In these circumstances, admission of the letter itself could not have added significantly to the prosecution's case.

*Criminal Cases* (1977) 44 Tenn.L.Rev. 1043, 1060.) The second article states that "[U]nless the forum regards judicial integrity as a separate basis for application of the exclusionary rule, the evidence should be admitted since the search activity that occurred outside the jurisdiction of the forum was not illegal." (Tullis & Ludlow, *Admissibility of Evidence Seized in Another Jurisdiction: Choice of Law and the Exclusionary Rule* (1975) 10 U.S.F. L.Rev. 67, 91.)

## III

Defendant's next assertion is that Stroud's identification of him at the trial was based upon unnecessarily suggestive pretrial procedures conducive to error, thereby depriving him of due process. He states that without Stroud's testimony, the prosecution's case depends entirely upon proof of motive and opportunity to murder the Wellmans, and that such evidence would be an insufficient basis for conviction. Thus Stroud's identification of him as the man who asked directions to the street where the Wellman home was located, about the time the murders were committed, was critical.[13]

According to Stroud, at 9 or 9:30 p.m., on December 14, he pointed the way to Scadlock Lane on two maps in the motel office to the man who asked for directions. He observed the visitor for a period of three to five minutes from a distance of about eighteen inches. The lighting was excellent.

The next night, Stroud heard about the Wellman murders on a television news program which mentioned that the victims had lived on Scadlock Lane. He immediately called the police, recounted to them the events of the night before, and described the person who had asked for directions as a black male about 6 feet 2 or 4 inches tall, weighing about 165 pounds. Defendant claims that Stroud also stated in his initial identification that the man had an eye which floated upwards but, while Stroud testified to this effect at the suppression hearing and at the trial, it is questionable whether he made that statement as part of his initial identification.

A few days later, a police artist prepared a composite drawing of the man described by Stroud. The drawing revealed a man with long sideburns. Defendant is 6 feet 1 inch tall, and at the time of trial weighed 215 pounds. He does not have a floating eye, and according to an expert witness, he is unable to grow sideburns.

Between December 29, 1975, and March 3, 1976, the police showed Stroud 39 photographs of black males, in 4 sets, each set containing between 6 and 15 pictures. Defendant appeared in three of those sets. In

---

[13]Stroud identified defendant at the first trial and testified at the suppression hearing and at the first trial regarding the pretrial identification procedures. He was deceased by the time of the second trial, and his testimony from the first trial was read to the jury.

the first, not containing a picture of defendant, Stroud picked a photograph which he said looked like the visitor at the motel; in the second set he chose the picture of someone other than defendant; in the third he chose defendant's picture and that of another,[14] and in the fourth set he identified none of the pictures.[15]

On May 13, 1976, five months after the murders, Stroud traveled to Philadelphia, where he picked defendant out of a lineup of seven men. All were black males, wearing blue pants and white shirts. Defendant was the oldest by 7 years, and he weighed 37 pounds more than any other man.[16] He was represented by counsel at the lineup.

■ The United States Supreme Court has held that a violation of due process occurs if a pretrial identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]; *Stovall* v. *Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967].) Whether due process has been violated depends on "the totality of the circumstances" surrounding the confrontation. (*Stovall* at p. 302 [18 L.Ed.2d at p. 1206].)

Defendant asserts that the use of the photographs for identification prior to the lineup was unnecessary and "programmed" Stroud to point out defendant at the lineup, and that the lineup itself was suggestive be-

---

[14]The third set was shown to Stroud twice. On February 17, he made no comment about any of the photographs in that set. When the same pictures were shown on March 3, he picked out defendant and another man.

[15]The pictures of defendant included in the third and fourth sets were similar, except that in the fourth set defendant was wearing dark glasses, while he wore no glasses in the third.

[16]The following tabulation shows the age, height and weight of the men in the lineup (defendant was number 4):

| NO. | AGE | HEIGHT | WEIGHT |
|-----|-----|--------|--------|
| 1 | 26 | 6'0" | 175 |
| 2 | 23 | 5'11" | 167 |
| 3 | 19 | 6'0" | 170 |
| 4 | 37 | 6'1" | 217 |
| 5 | 30 | 5'11" | 160 |
| 6 | 23 | 5'11" | 170 |
| 7 | 25 | 6'1" | 180 |

cause of the dissimilarity in the appearance between defendant and the other persons appearing therein.

■ While the danger of using photographs for identification prior to the corporeal lineup has been recognized because "the witness...is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification" (*Simmons, supra,* 390 U.S. at pp. 383-384 [19 L.Ed.2d at p. 1253]), under the circumstances here the procedure was clearly justified. It is true that suspicion had focused on defendant immediately after the murders; nevertheless, it was obviously important to determine the identity of the man who asked Stroud for directions to Scadlock Lane, and the pictures were used for this purpose.

Nor do we agree that photographic identification was unnecessary because the prosecution had the alternative of presenting defendant at a corporeal lineup by arresting him for violating parole in leaving Pennsylvania without permission. In fact, he was a fugitive from justice during much of the period in which the photographic identifications were made. A warrant had been issued for defendant's arrest in January 1976, and he was not arrested until May 10, 1976. The lineup in Philadelphia occurred three days later.

■ The claim that Stroud was "programmed" by having been shown several sets of photographs in which defendant appeared three times is without merit. Stroud picked four men, including defendant, from among 39 photographs shown him. Defendant does not claim that the photographs themselves were a suggestive display. The second set contained a picture of defendant not identified by Stroud, although he picked defendant out of the third set. The pictures shown to Stroud are in evidence, and they demonstrate that the photograph of defendant in the second set is dramatically different than in the third set,[17] so that the likelihood of a "programming" effect from the showing of these photographs is minute. In the fourth group, as we have seen, defendant's picture was substantially similar to his picture in the third, except that he was wearing dark glasses. Stroud did not pick out any photographs from this fourth set.

---

[17] In the second set of photographs, defendant is wearing a plaid shirt, has a moustache, and appears considerably heavier than in the third set. Stroud's failure to identify defendant the first time he was shown the third set of photographs, when they were displayed at the same time as the second, may be explained by this obvious difference between defendant as depicted on the second and third sets.

In these circumstances, it cannot be said, as defendant claims, that Stroud was influenced by repetitive showings of defendant's picture to pick defendant out of the lineup.

The next question is whether the lineup itself was impermissibly suggestive because of the differences in appearance between defendant and the other participants. Defendant asserts that the "sine qua non of lineup fairness" is similarity in appearance between the accused and the other participants because the "unique or different draws attention and is more likely to be picked." (Citing Buckhout, *Eyewitness Testimony* (Dec. 1974) Scientific Am. 23; Note, *Pretrial Identification* (1971) 55 Minn.L.Rev. 779, 803.) ■ While this statement is valid to some extent, "there is no requirement that a defendant in a lineup must be surrounded by people nearly identical in appearance." (*Wright* v. *Smith* (W.D.N.Y. 1977) 434 F.Supp. 339, 342 [revd. on other grounds in *Wright* v. *Smith* (2d Cir. 1978) 569 F.2d 1188].)

In the lineup conducted here, the recounting of the age, height and weight of the participants as set forth in footnote 16 might indicate a marked disparity between the appearance of defendant and the other six persons, but, photographic slides of the lineup in evidence demonstrate that defendant does not appear to be significantly taller, heavier, or older than the other participants.[18] Cases which have held lineups to be impermissibly suggestive involved differences between the participants more glaring than those present here.[19]

---

[18]The record also contains a videotape of the lineup, which the trial court viewed at the suppression hearing.

[19]In *People* v. *Caruso* (1968) 68 Cal.2d 183, 187 [65 Cal.Rptr. 336, 436 P.2d 336], defendant was 6 feet 1 inch tall, weighed 238 pounds, and was of Italian descent, with a very dark complexion, and dark, wavy hair. He was placed in a four-man lineup in which no one was his size, none had his dark complexion, and none had dark, wavy hair. In *United States* ex rel. *Cannon* v. *Smith* (W.D.N.Y. 1975) 338 F.Supp. 1201, 1204, only defendant wore a distinctive green shirt, and the victim had described the assailant as having worn a shirt of that color. In *Martin* v. *State of Ind.* (N.D.Ind. 1977) 438 F.Supp. 234, 236-237, defendant, described by the victim as a "dark-skinned colored man," tall, heavy, and between 32 and 36 years old, was placed in a 12-man lineup in which the only other black aside from defendant was 18 years old and 5 feet 3 inches tall. Defendant alone was requested to speak, and only he wore prison garb. In *State* v. *Henderson* (1977) 116 Ariz. 310 [569 P.2d 252, 256-257], defendant who was 36 years old, was placed in a lineup with five men between the ages of 20 and 24; he was larger and heavier than others in the lineup. However the identification made at the lineup was held to be admissible because other factors suggested that it was reliable.

■ Nevertheless, urges defendant, the identification by Stroud was unreliable because he did not have sufficient opportunity to view the man who asked for directions, because his description to the police shortly after the crime markedly differs from defendant's appearance, and because five months had elapsed between the time of Stroud's observation and the lineup.

It seems clear to us that Stroud had a sufficient opportunity to observe the man in question. Their conversation lasted three to five minutes in a well-lit room, in which the parties were only eighteen inches apart. Although Stroud's description of defendant to the police shortly after the crimes as weighing about 165 pounds was incorrect (he weighed 215 pounds at the time of trial and 217 pounds at the lineup), there was some evidence that defendant weighed less at the time of the crimes.[20] It is true, however, that defendant did not have sideburns or a floating eye, and the lineup was conducted five months after the crimes.

In spite of these discrepancies, there are significant factors pointing in the direction of reliability. Defendant's photograph was one of four chosen among 39 presented to Stroud, he was identified at a fair lineup, and Stroud had ample opportunity to observe defendant under excellent lighting conditions. In these circumstances, we cannot say that there was a substantial likelihood of misidentification because of impermissibly suggestive pretrial procedures, or that Stroud's testimony was demonstrably unreliable.

Next, defendant asserts that the trial court erred in failing to give on its own motion a cautionary instruction regarding eyewitness identification testimony. At defendant's request, the court gave a special instruction stating that the jury should accord to defendant's evidence suggesting that the photographic lineup identification was unfair and unreliable the weight to which it was entitled. No request was made either for instruction No. 2.91 in the California Book of Jury Instructions, Criminal (CALJIC)[21] nor the more elaborate instructions

---

[20]The United States attorney in Philadelphia who was conducting the investigation for obstruction of justice, testified that defendant weighed 10 or 20 pounds less in September 1975, 3 months before the crimes, than he weighed at trial. The photograph of defendant selected by Stroud from the display shown him before the lineup, taken in September 1975, depicts a man with a slender face.

[21]CALJIC No. 2.91 states: "The burden is on the State to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged. You must be satisfied beyond a reasonable doubt of the accuracy of the identification of defendant as the person who committed the offense before you may convict

on identification set forth in *People* v. *Guzman* (1975) 47 Cal.App.3d 380, footnote 1, at pages 386-387 [121 Cal.Rptr. 69].

Defendant claims that because of the unreliability of the identification evidence and the importance of that evidence in the present case, the court should have given either of these instructions on its own motion under the principles of *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913], and *People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390]. In those cases, we held that a trial court must, on its own motion, if necessary, instruct the jury on the general principles of law relevant to the issues raised by the evidence, and we defined such principles as those "closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*St. Martin,* at p. 531; and see *People* v. *Freeman* (1978) 22 Cal.3d 434 [149 Cal.Rptr. 396, 584 P.2d 533], holding that the trial court need not give instructions on an alibi defense on its own motion.)

In a recent case it was held under these principles that a court is not required to give CALJIC No. 2.91 on its own motion since the correctness of identification does not constitute an affirmative defense, and the court's general instructions on credibility and burden of proof were sufficient to inform the jury of the test they should apply to the identification evidence. (*People* v. *Richardson* (1978) 83 Cal.App.3d 853, 860-862 [148 Cal.Rptr. 120].)

Here the court gave such general instructions,[22] and it also told the jury that if they had a reasonable doubt that defendant was present when the crimes were committed, they should find him not guilty. (CALJIC No. 4.50.) It was unmistakable to the jury that defendant was challenging the reliability of Stroud's identification, and these instructions were sufficient to inform them that the prosecution had the burden of proof on that issue and that defendant should be acquitted if they had a reasonable doubt on the matter.

---

him. If, from the circumstances of the identification, you have a reasonable doubt whether defendant was the person who committed the offense, you must give the defendant the benefit of that doubt and find him not guilty."

[22]The jury was instructed regarding the credibility of witnesses (CALJIC No. 2.20); discrepancies in testimony (CALJIC No. 2.21); weighing conflicting testimony (CALJIC No. 2.22); the sufficiency of the testimony of one witness (CALJIC No. 2.27); and reasonable doubt (CALJIC No. 2.90).

## IV

 Defendant asserts also that the trial court improperly allowed defendant to be impeached on a collateral matter. On cross-examination, defendant stated that he had never carried a gun on his person, but he admitted that this statement was incorrect after he was informed, in a hearing outside the presence of the jury, that the prosecution had evidence that he had carried a gun in the past.

Under Evidence Code section 352, a court may in its discretion exclude evidence if the probative value of the evidence is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice or mislead the jury. We cannot say here that the court abused its discretion. Defendant failed to object for tactical reasons to the question whether he had ever carried a gun. He took the chance that the court would allow impeachment of this statement in order to avoid leaving the jury with the erroneous impression that his denial was truthful.

Moreover, there was considerable other evidence casting doubt on defendant's credibility. According to his own testimony, he often used false names, bought stolen airline tickets at cut-rate prices for travel on his narcotics buying trips, and employed stolen credit cards to pay his hotel bills.

## V

 Defendant argues next that the trial court erred in excluding from evidence a tape recording of an interview of a witness, made while the witness was under hypnosis. As we have seen, a neighbor of the Wellmans testified that she had seen two black men leaving the Wellman residence about 11 p.m. on the night of the murders and enter an older model white car. She could not recall anything about their appearance. On March 23, 1976, while under hypnosis induced by a police hypnotist, she said that the men were about 5 feet 8 inches tall and weighed approximately 140 to 150 pounds. At the trial, the witness testified that she could not remember anything about the statements made while under hypnosis and she could not swear that they were true. The prosecution objected to their introduction[23] and the trial court rejected defendant's attempt to admit them under the hearsay exception for past recollection recorded. (Evid. Code, § 1237.)

[23]The statements were admitted into evidence at defendant's first trial.

On appeal defendant admits that the court correctly ruled that the statements were hearsay and did not come within the exception to the hearsay rule stated in section 1237 of the Evidence Code. But, he claims, technicalities do not always comport with due process, and in view of the importance of the evidence to the defense, the statements should not have been excluded merely because they did not come within any recognized exception to the hearsay rule. Defendant cites *Chambers* v. *Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038], in support of this assertion.[24]

Contrary to defendant's contention, the trial court's ruling did not elevate a fastidious adherence to the technicalities of the law of evidence over the right to a fair trial. For here, unlike *Chambers,* there was no solid assurance that the hearsay statements were reliable. It appears to be the rule in all jurisdictions in which the matter has been considered that statements made under hypnosis may not be introduced to prove the truth of the matter asserted because the reliability of such statements is questionable. While in California such statements—and those made under the influence of truth serum—may be used to establish a basis for expert opinion, the cases either state specifically or assume that they are not admissible to prove the truth of the matter therein contained. (See, e.g., *People* v. *Modesto* (1963) 59 Cal.2d 722, 732-733 [31 Cal.Rptr. 225, 382 P.2d 33] [overruled on other grounds in *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]]; *People* v. *Johnson* (1973) 32 Cal.App.3d 988, 1000-1002 [109 Cal.Rptr. 118]; *People* v. *Hiser* (1968) 267 Cal. App.2d 47, 61-62 [72 Cal.Rptr. 906, 41 A.L.R.3d 1353]; cf. *People* v. *Cartier* (1959) 51 Cal.2d 590, 600-601 [335 P.2d 114]; *People* v. *Jones* (1954) 42 Cal.2d 219, 225 [266 P.2d 38].) The rule is the same in other jurisdictions. (See 29 Am.Jur.2d, Evidence, § 831, p. 924; Annot. (1952) 23 A.L.R.2d 1306, 1310.)

Defendant's claim that there were assurances the witness was telling the truth under hypnosis is unpersuasive. The fact that she was a neutral person and had no reason to falsify her statements under hypnosis

[24]In *Chambers,* a defendant convicted of murder was not permitted to introduce the testimony of three witnesses to whom one McDonald had confessed the crime because Mississippi had no exception to the hearsay rule for declarations against penal interest. It was held that the hearsay statements by McDonald were made under circumstances that provided considerable assurance of their reliability and the evidence was critical to the defense, and that in these circumstances the hearsay rule should not be applied "mechanistically to defeat the ends of justice." (410 U.S. at p. 302 [35 L.Ed.2d at p. 313].)

and that she intended to tell the truth are obviously insufficient to establish reliability, especially in the light of expert testimony that there is no way to determine if a person under hypnosis is relating actual facts. Thus, the trial court acted properly in excluding the statements.

## VI

Finally, defendant asserts that the trial court should have granted his motion of acquittal because the evidence is insufficient to support a finding of guilt.[25] He admits that the prosecution established both that defendant had a motive for the murders and that he was in Los Angeles on the night they occurred, but reiterates that Stroud's identification was unreliable and that without his testimony there was no solid evidence to connect defendant with the crimes.

The motion for acquittal was made under Penal Code section 1118.1.[26] In considering such a motion, the trial court applies the same test as does an appellate court in reviewing a judgment of conviction. (*People* v. *Wong* (1973) 35 Cal.App.3d 812, 828 [111 Cal.Rptr. 314].) On this record, we cannot say that the evidence is insufficient to support the conviction or that a rational trier of fact could not reasonably have found defendants guilty of the murders. (*Jackson* v. *Virginia* (1979) 443 U.S. 307, — [61 L.Ed.2d 560, 573, 99 S.Ct. 2781, 2789].) In addition to demonstrating defendant's motive and his access to the Wellmans, the prosecution showed that defendant asked directions to Scadlock Lane about the time the murders occurred, that the gun used in the murders came from a place close to defendant's home city, and that two black men were seen leaving the Wellman residence shortly after the murders. There was also evidence to rebut defendant's alibi: no report had been filed that the Ford Thunderbird rented by defendant had a breakdown, and there was no evidence that the Wellmans

[25]In denying the motion, the court stated that, although the evidence was not "convincing to the point...anyone could be certain" of its sufficiency, the matter should go to the jury since the prosecution's evidence "certainly creates a strong suspicion."

[26]Section 1118.1 of the Penal Code states: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

owned a Volkswagen with a Rolls Royce grille, the car defendant testified Renate was driving when she met him to conclude the sale of cocaine. The testimony of defendant's probation officer regarding a false description of his whereabouts on the weekend of December 14 and 15 is evidence of consciousness of guilt.

We have concluded above that the trial court erred in failing to suppress the evidence regarding the charges made by defendant on his Diner's Club card and the telephone call made by defendant to Wellman from the Hyatt House. Under all the circumstances, these errors were not prejudicial. The evidence based on the credit card revealed only that defendant had charged with the card his hotel bills in Oakland and Los Angeles and three tickets on TWA from Los Angeles to Baltimore on December 15.[27] By June 11, the date on which the Diner's Club representative turned the information over to the prosecutor, the police had long been aware that defendant had been a guest of these two hotels on certain dates. The fact that he paid his hotel bills with a Diner's Club card was of no significance. Nor was the case against defendant enhanced by the circumstance that the police discovered defendant left Los Angeles on December 15, the morning after the murders, by tracing the TWA tickets charged on the card. The evidence that defendant called Wellman from Oakland on the day of the murders did not significantly advance the prosecution's case since the jury was aware, from evidence properly admitted, that defendant was in Los Angeles on the night of the murders, that he was acquainted with Wellman, and that he had asked directions to the street on which Wellman lived about the time of the murders. It is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the trial court's errors in admitting this evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is affirmed.

Bird, C. J., Tobriner, J., Clark, J., Richardson, J., Manuel, J., and Newman, J., concurred.

---

[27]Prior to the time the billings were turned over to the prosecution, a Diner's Club representative told the police that three tickets on TWA had been purchased with the Diner's Club card, and gave them the number of the tickets.