252 P.3d 1229 (2011)
STATE of Hawai`i, Respondent and Petitioner/Plaintiff-Appellee,
v.
Jenaro TORRES, Petitioner and Respondent/Defendant-Appellant.
No. 28583.
Supreme Court of Hawai`i.
April 15, 2011.
As Amended April 19, 2011.
Cynthia A. Kagiwada, for petitioner and respondent/defendant-appellant.
*1230 Deirdre Marie-Iha, Deputy Solicitor General, Susan Y.N. Won, Deputy Attorney General, State of Hawai`i, for respondent and petitioner/plaintiff-appellee.
ACOBA, and DUFFY, JJ., Circuit Judge, POLLACK in Place of RECKTENWALD, C.J., recused, and Circuit Judge BORDER Assigned due to a vacancy; with NAKAYAMA, Acting C.J., Concurring Separately and Dissenting.
Opinion of the Court by ACOBA, J.
We hold that where the State seeks to prosecute a defendant in a Hawai`i state court, any evidence upon which the prosecution seeks to rely must have been obtained in a manner that comports with the Hawai`i Constitution and applicable case law. Respondent and Petitioner/Plaintiff-Appellee State of Hawai`i (Respondent) and Petitioner and Respondent/Defendant-Appellant Jenaro Torres (Petitioner) applied for writs of certiorari to review the January 7, 2010 judgment of the Intermediate Court of Appeals (ICA)[1] filed pursuant to its December 15, 2009 published opinion vacating the May 29, 2007 judgment of conviction filed by the circuit court of the first circuit (the court).[2] We accepted Petitioner's Application for writ of certiorari (Petitioner's Application or Application) to review the ICA's analysis with regard to the admissibility of evidence obtained by federal officers in a state court prosecution. In accordance with the opinion set forth herein, we uphold that portion of the ICA's opinion affirming the legality of the searches of Petitioner's vehicle under federal law. However, we correct the opinion of the ICA insofar as it failed to additionally consider whether the searches of Petitioner's vehicle also comported with the Hawai`i Constitution and applicable case law. We affirm the opinion of the ICA in all other respects and we affirm the court's December 5, 2006 order denying Petitioner's motion to suppress under the Hawai`i Constitution.

I.
The following relevant facts, some verbatim, are from the ICA opinion and the record.

A.
Ruben Gallegos (Gallegos) worked as a cashier at the Pearl Harbor Naval Base (PHNB) Navy Exchange. State v. Torres, 122 Hawai`i 2, 6, 222 P.3d 409, 413 (App. 2009). On May 1, 1992, Gallegos was assigned to cash paychecks at a satellite cashier's cage (cashier cage). Id. at 7, 222 P.3d at 414. Prior to reporting to the cashier cage, Gallegos received $80,000 in cash. Id. Shortly after Gallegos had been escorted to the cashier cage, Petitioner, who was a police officer at PHNB, arrived at the cashier cage in his police uniform, although Petitioner was not scheduled to work on that day. A witness saw Gallegos exit the cashier cage carrying the canvas cash bag and saw the two men walk toward the parking area. Id. Military authorities were subsequently notified that Gallegos was not at his post and "an all points bulletin was issued to detain and arrest [Petitioner] and Gallegos[.]" Id. at 8, 222 P.3d at 415.
Later that day, PHNB police officer Napoleon Aguilar (Officer Aguilar) saw Petitioner in a line of cars waiting to enter PHNB. Id. Officer Aguilar waived Petitioner through, but, once through, motioned for him to stop. Id. When Petitioner rolled down his window to shake Officer Aguilar's hand, Officer Aguilar reached into Petitioner's vehicle and turned off the ignition. Id. A struggle ensued but Petitioner eventually complied with Officer Aguilar's orders, exited the vehicle, and was arrested. Id. Because Petitioner's vehicle was blocking traffic, PHNB Police Sergeant James Rozkiewicz (Sergeant Rozkiewicz) moved it to a nearby parking lot. Id. Pursuant to base procedures for securing an unattended vehicle, Sergeant Rozkiewicz checked the vehicle and the trunk for hazardous or flammable substances. Id. When Sergeant Rozkiewicz attempted to lock *1231 the glove compartment, the compartment door fell open, revealing a .38 caliber revolver and a scanner. Id.
Naval Criminal Investigative Service (NCIS) Special Agent Ty Torco (Agent Torco) prepared an affidavit in support of a Command Authorization for Search and Seizure (Command Authorization), seeking authorization to search Petitioner's vehicle. Id. at 16, 222 P.3d at 423. The affidavit detailed the information Agent Torco had learned regarding Petitioner's alleged involvement in the theft of $80,000 from the Navy Exchange and also included the observations made by Sergeant Rozkiewicz during his inspection and securing of Petitioner's vehicle. Id. The Command Authorization was signed by E.A. Warner, Commander of PHNB. Id.
A subsequent search of Petitioner's vehicle by NCIS and FBI agents revealed a brown bag in the trunk, which NCIS agents recognized as the type of bag used by the Navy Exchange to transport cash. Id. at 8, 222 P.3d at 415. The bag contained $77,971.82 in cash, along with other items, including a wallet in which Gallegos's driver's license, Navy Exchange identification card, bank card, temporary pass to Pearl Harbor, and other papers were found. Id. NCIS agents also recovered a .38 caliber revolver registered to Petitioner, a stun gun, and a scanner in the glove compartment. Id. NCIS agent Robert Robbins (Agent Robbins) testified at Petitioner's trial that upon examination of the revolver obtained from Petitioner's vehicle, he discovered that there were two intact bullets and three spent cartridge casings in the revolver. Id. Gallegos, who had been reported missing on May 1, 1992, was never seen again. Id.
Petitioner was subsequently charged by the federal government with theft and possession of a loaded firearm on a public highway without a license. Id. at 6, 222 P.3d at 413. Petitioner pled no contest to both charges in federal court and was sentenced to concurrent terms of two years of imprisonment. Id.
Thirteen years after the federal charges were filed, Respondent charged Petitioner with murder in the second degree of Gallegos, in violation of Hawai`i Revised Statutes (HRS) § 707-701.5 (Supp.1992).[3] The indictment further stated that Petitioner was subject to sentencing under HRS § 706-660.1 (Supp.1992),[4] for having "a firearm in his possession or threatened the use or used the firearm while engaged in the commission of [a] felony, whether the firearm was loaded or not, and whether operable or not."

B.
On July 24, 2006, Petitioner filed a Motion to Suppress Evidence No. 2 with the court, seeking to preclude all evidence obtained from the search of his automobile, including the handgun, stun gun, scanner, victim's wallet, identification, and other papers, nearly seventy-eight thousand dollars, and all testimony derived therefrom. Petitioner claimed that the searches of his vehicle violated article I, section 7 of the Hawai`i Constitution[5] and the Fourth[6] and Fourteenth[7] Amendments to the United States Constitution.
*1232 On January 10, 2007, the court issued its Order Denying Petitioner's Motion to Suppress No. 2 (order). In its order, the court made the following findings of fact (findings).
1. On May 1, 1992, [Sergeant Rozkiewicz was] on duty as a base police officer for the [PHNB] and was the acting desk lieutenant. At the time, he had been employed as a base police officer for 6 years.
2. On May 1, 1992, [Officer Aguilar] was also working as a [PHNB] police officer and assigned to guard duty at the Makalapa Gate of the [PHNB].
3. The [PHNB] is a place where nuclear submarines, ships and other military transport vehicles are housed.
4. The [PHNB] also has various officers in high command positions stationed on the base.
5. The [PHNB] had specific regulations for entrance onto the base as provided for in the Internal Security Act of 1950.
6. Pursuant to the Internal Security Act of 1950, the [PHNB] posted a clear and visible sign at the entrance gate which stated: "Authorized Entry Onto This Installation Constitutes Consent To Search Of Personnel And The Property Under Their Control. Internal Security Act of 1950 Section 21; 50 U.S.C. 797."
7. The aforementioned sign was posted at the Makalapa Gate prior to and on May 1, 1992.

8. Any person who, after reading the sign, decides not to consent to a search of their [sic] person or property can turn around and leave without having their [sic] person or property searched.

9. Additionally, the guard shack where a person would have to report in order to gain entrance onto the base was located approximately 50 feet past the sign, thus giving a person ample opportunity to turn around if the person did not want to be subjected to a search of their [sic] person or property.

10. The duties of a base police officer included enforcement of rules and regulations regarding entry onto the base as well as enforcement of the laws on the base.
11. [Sergeant] Rozkiewicz had receiving [sic] recruit training and other ongoing or recall training regarding the rules and regulations on base.
12. Prior to May 1, 1992, [Sergeant] Rozkiewicz was [Petitioner's] supervisor. [Petitioner] was also employed as a [PHNB] police officer. [Petitioner] had knowledge of the rules and regulations concerning entry onto the base because he had received training regarding the Internal Security Act of 1950 and the regulations concerning procedures to search persons and property.
13. [Officer] Aguilar and [Petitioner] went to training together in June 1990 at the Pearl Harbor police academy and they received training on the Internal Security Act of 1950.
14. On May 1, 1992, prior to 2:30 p.m., [Sergeant] Rozkiewicz was aware of the theft of $80,000.00 from the Navy Exchange and that the persons involved was [sic] the courier [] [Gallegos] and [Petitioner].
15. Sometime after 11:00 a.m., [Officer] Aguilar received information from [Sergeant] Rozkiewicz and Major Cruciano that both Gallegos and [Petitioner] were suspects in the theft of $80,000.00 from the Navy Exchange.
16. Around 2:10 p.m., [Officer] Aguilar saw [Petitioner]'s vehicle, a silver-gray Chevrolet Celebrity with the license place "KUNSIL" approach the Makalapa Gate.
17. [Petitioner] entered the Makalapa Gate, at which time [Officer] Aguilar motioned for him to stop the vehicle. Upon *1233 stopping the vehicle, [Officer] Aguilar reached into the vehicle to turn it off and grabbed the shifting level which was already in park.
18. [Officer] Aguilar informed [Petitioner] that [ ] [NCIS] wanted to talk to him about the incident, [Petitioner] began to struggle to restart the vehicle.
19. [Officer] Aguilar then ordered [Petitioner] out of the vehicle and issued a felony stop.
20. [Petitioner] complied with [Officer] Aguilar's order and stepped out of his vehicle.
21. [Petitioner] was ordered to lie face-down in the grassy median strip and subsequently handcuffed.
22. When [Sergeant] Rozkiewicz arrived on the scene around 2:30 p.m., he observed traffic backing up from the inbound lanes of the Makalapa Gate to Kam Highway. [Sergeant] Rozkiewicz then made a decision to get traffic going and moved the vehicle into the base chapel parking lot that was approximately 31 feet away.

23. After moving the vehicle, [Sergeant] Rozkiewicz followed base police procedures in securing the vehicle, which required police to check a vehicle that was going to be left unattended on base, for flammable or volatile substances such as gasoline, kerosene and explosives.
24. [Sergeant] Rozkiewicz attempted to secure and lock the glove compartment within [Petitioner's] vehicle by using what he thought was the key for the glove compartment. In doing so, the glove compartment lid fell down, at which time, [Sergeant] Rozkiewicz observed a scanner and a pistol in the glove compartment.

25. The viewing of the contents in the glove compartment by [Sergeant] Rozkiewicz was inadvertent and at the time, [Sergeant] Rozkiewicz was not searching for evidence pertaining to the theft of $80,000.00 from the Navy Exchange or the murder of [] Gallegos. Further, [Sergeant] Rozkiewicz did not remove or search the glove compartment after the initial inadvertent viewing of the glove compartment contents.
26. [Sergeant] Rozkiewicz opened the trunk of [the] vehicle to make a visual check and ensure there were no items within the truck that would "catch fire" or explosives, and during this check, [Sergeant] Rozkiewicz observed a base police uniform shirt, a pair of dark trousers, a Sam Browne leather gear and a black plastic bag that was partially open, exposing a section of brown leather.
27. The visual check of the truck comported with the [PHNB] police routine to secure vehicles on base [] to ensure the safety of the personnel and the military transport vehicles on base, and that the routine check was not for the purpose of searching for evidence pertaining to the theft of the $80,000.00 or the murder of [ ] Gallegos.
28. When [Petitioner] approached the [PHNB] Makalapa Gate, he intended to gain entry onto the base.
29. Searches conducted pursuant to the Internal Security Act of 1950 is [sic] necessary for the protection of military transport vehicles and base personnel.
30. [Petitioner] did not indicate to anyone that he was revoking his consent to enter onto the base or that he intended to leave the base. As such, because of [Petitioner's] training and knowledge of base procedures, he consented to a search of his person and vehicle when he entered the Makalapa Gate.
(Emphases added.)
The court made the following conclusions of law (conclusions).
1. The Internal Security Act of 1950 (50 U.S.C. 797) authorized the search of a [d]efendant's person and property under his control.
2. There was a government interest in protecting the [PHNB] and a person with notice of such impending search into a restricted area with heightened security relinquishes any reasonable expectation of privacy. United States v. Jenkins, 986 F.2d 76, 79 ([4th Cir.] 1993).
3. Great deference must be shown to the special needs of the Armed [F]orces at *1234 military and naval installations. United States v. Ellis, 15 F.Supp.2d 1025 (1998).
4. Searches on closed military bases are exempt from the usual Fourth Amendment requirements of "probable cause." [Jenkins], 986 F.2d 76[].
5. [Petitioner] having knowledge of the Internal Security Act of 1950, his conduct of driving onto the [PHNB] and the absence of any evidence to indicate that [Petitioner] revoked his consent demonstrate [] that [Petitioner] consented to a search of his person and property under his control when he entered the Makalapa Gate. See State v. Hanson, 97 Hawai`i 71, 34 P.3d 1 (2001) [(hereinafter, "Hanson II"), affirming State v. Hanson, 97 Hawai`i 77, 34 P.3d 7 (App.) (hereinafter, "Hanson I")].
6. There was no search within the meaning of [a]rticle 1, [s]ection 7 of the Hawai`i State Constitution, the Fourth and Fourteenth Amendments of the United States Constitution where [Sergeant] Rozkiewicz was following base procedures to secure the vehicle, at which time, the glove compartment door fell open and thereby exposing the pistol and scanner inside the glove compartment.
7. Because the investigating officers had sufficient probable cause to obtain a search warrant at the time [Petitioner] entered the Makalapa Gate of the [PHNB], the investigating officers would have inevitably obtained a [Command Authorization] pursuant to Rule 315, Military Rules of Evidence. State v. Lopez, 78 Hawai`i 433, 896 P.2d 889 (1995).
(Emphases added.) Respondent did not challenge the findings and conclusions of the court. Therefore, the court's findings are binding in the instant appeal and furthermore, any objections to the court's findings and conclusions are deemed waived. "[Points not argued may be deemed waived." Hawai`i Rules of Appellate Procedure Rule 28(b)(7) (2010).

C.
Trial commenced on March 6, 2007. At trial, Susan Davis (Davis) testified that she became acquainted with Petitioner while Davis and Petitioner were working for a pharmaceutical company. Torres, 122 Hawai`i at 9, 222 P.3d at 416. According to Davis, Petitioner confided to her that he had been involved in a robbery and insinuated that he had killed one of the individuals involved. Id. Davis testified that she had not told anyone because Petitioner had threatened to harm her and her family if she did. Id.
On March 21, 2007, a jury convicted Petitioner of murder in the second degree and found that Petitioner possessed, used, or threatened the use of a revolver during the commission of a murder, and on May 29, 2007, Petitioner was sentenced by the court. On June 8, 2007, Petitioner filed a notice of appeal.

D.
On December 15, 2009, the ICA vacated the court's judgment and remanded the case for a new trial based on its conclusion that the court erred in admitting the testimony of NCIS Agent Robbins regarding the time-frame during which the revolver purportedly used in the murder was fired.[8]Torres, 122 Hawai`i at 34, 222 P.3d at 441. The ICA also concluded that (1) there was substantial independent evidence to corroborate Petitioner's incriminating statements, and, therefore, the admission of such statements was correct, id. at 12, 222 P.3d at 419; (2) federal law, as *1235 opposed to Hawai`i law, applied to Petitioner's motion to suppress, id. at 17, 222 P.3d at 424; and (3) under federal law, the search of Petitioner's vehicle was lawful inasmuch as the search met federal exceptions to the search warrant requirement, id. at 20-26, 222 P.3d at 427-33.
On April 7, 2010, Petitioner and Respondent each applied for review of the ICA's opinion. We rejected Respondent's Application for Writ of Certiorari. As indicated, we accepted Petitioner's Application to correct the ICA's opinion with respect to the admissibility of evidence obtained by federal officers in a state court prosecution.

II.
Petitioner presents the following questions in his Application:
I. Whether the ICA gravely erred by holding that [Respondent] presented substantial independent evidence which corroborated Davis'[s] hearsay testimony regarding [Petitioner's] inculpatory statements[.[9]]

II. Whether the ICA gravely erred by determining that federal law rather than Hawai`i law should apply to [Petitioner's] suppression motion and also whether its decision is inconsistent with State v. Bridges, 83 Hawai`i 187, 925 P.2d [357] (1996)[.[10]]
III. Whether the ICA's decision regarding exceptions to the search warrant requirement is inconsistent with Arizona v. Gant, [___ U.S. ___,] 129 S.Ct. 1710 [173 L.Ed.2d 485] (2009)[,] and whether the ICA gravely erred by determining that other exceptions to the warrant requirement applied[.[11]]
(Emphasis added.)

III.

A.
This court in Bridges considered the circumstances under which "evidence obtained in one state [must] be suppressed in a criminal prosecution in another state[.]" 83 Hawai`i at 194, 925 P.2d at 364. Bridges noted that the issue "ha[d] been analyzed in two ways: conflicts of law analysis and an exclusionary rule analysis." Id. at 195, 925 P.2d at 365 (internal quotation marks and citation omitted). "Under a conflicts of law approach, courts analyze the issue as if it were a civil case and apply the choice of law method of the forum state to determine whether the law of the forum state or the situs state should be followed," and the "sanctions [] to be used if the appropriate law is violated." Id. (internal quotation marks and citation omitted).
Under the alternative exclusionary rule analysis, "the court first identifies the principles to be served by the exclusionary rule,[[12]] and then evaluates how the principles would be served by exclusion." Id. (internal quotation marks and citation omitted). The Bridges court designated the exclusionary rule analysis, discussed infra, as the "better approach" to resolving issues regarding whether evidence obtained in another jurisdiction *1236 must be suppressed in a criminal prosecution in this state. Id.

B.
This court has not yet squarely addressed the circumstances under which evidence obtained by federal law enforcement officers must be evaluated in a state prosecution. Some jurisdictions have held that evidence obtained by federal agents acting lawfully under federal authority is admissible in state prosecutions. See Pena v. State, 61 S.W.3d 745, 754 (Tex.App.2001) ("Evidence that is obtained by federal agents acting lawfully and in conformity with federal authority is admissible in state proceedings." (Citing Gutierrez v. State, 22 S.W.3d 75, 84 (Tex. App.2000).)). "This has been referred to as the `reverse silver-platter' doctrine.[[13]] The underlying concept of the [] doctrine is that protections afforded by the constitution of a sovereign entity control the actions only of the agents of that sovereign entity." Id. (internal quotation marks and citation omitted). Another rationale of courts adopting this approach has been that "a state's constitution that will not be invoked to control the conduct of its private citizens will not be applied to control the conduct of the officers of a foreign jurisdiction." E.g., State v. Mollica, 114 N.J. 329, 554 A.2d 1315, 1325 (1989).
On the other hand, some jurisdictions have adopted the exclusionary rule analysis for resolving when evidence obtained by federal law enforcement officers must be suppressed in a state criminal prosecution. See State v. Davis, 313 Or. 246, 834 P.2d 1008, 1012 (1992) (explaining that because Oregon's exclusionary rule protects individual rights, "[i]f the government seeks to rely on evidence in an Oregon criminal prosecution, that evidence must have been obtained in a manner that comports with the protections given to the individual by Article I, section 9, of the Oregon Constitution"); see also State v. Cardenas-Alvarez, 130 N.M. 386, 25 P.3d 225, 232 (2001) (noting that, pursuant to the state constitution,[14] "when a federal agent effectuates [] an intrusion and the State proffers the evidence thereby seized in state court," such evidence is "subject[ed] [] to New Mexico's exclusionary rule").

IV.
Reviewing the two aforementioned approaches ("reverse silver platter doctrine" and exclusionary rule analysis), we agree with the ICA insofar as it determined that the exclusionary rule analysis applies to resolve the issue of whether evidence obtained by federal officers should be admitted in a state prosecution. However, for the reasons discussed infra, we disagree with the ICA's holding that the exclusionary rule analysis "supports the application of federal law" alone in the instant case. Torres, 122 Hawai`i at 18, 222 P.3d at 425.

V.
As recounted, unlike a conflicts of law approach, an exclusionary rule analysis requires *1237 us to consider the principles served by that rule. See supra. Bridges identified three purposes underlying our exclusionary rule: judicial integrity, protection of individual privacy, and deterrence of illegal police misconduct. This court stated that
[i]n Hawai`i, we have recognized a number of purposes underlying our exclusionary rule: (1) judicial integrity, State v. Pattioay, 78 Hawai`i 455, 468, 896 P.2d 911, 924 (1995) ("to ensure that evidence illegally obtained by government officials or their agents is not utilized in the administration of criminal justice through the courts"); (2) individual privacy, [Lopez], 78 Hawai`i [at] 446, 896 P.2d [at] 902[] ("to protect the privacy rights of our citizens" (emphasis omitted)); and, of course, (3) deterrence, Pattioay, 78 Hawai`i at 468, 896 P.2d at 924 ("to deter illegal police conduct").
83 Hawai`i at 195, 925 P.2d at 365.

A.
"The `judicial integrity' purpose of the exclusionary rule is essentially that the courts should not place their imprimatur on evidence that was illegally obtained by allowing it to be admitted into evidence in a criminal prosecution." Id. at 196, 925 P.2d at 366. According to Bridges, "[a]s a general rule, the question of whether given conduct is legal is answered by looking to the laws of the jurisdiction in which that conduct was performed, i.e., the situs state." Id. (citation omitted). Consequently, Bridges reasoned that because in that case, "[t]he evidence was apparently obtained in compliance with the laws of the state of California[,] . . . under the general rule," admission of the evidence "would not cause a loss of judicial integrity." Id.
Relying on Bridges, the ICA noted that (1) "[n]o Hawai`i law enforcement officer was involved in the searches of [Petitioner's] car"; and (2) "[t]he searches were conducted on a federal military base by federal officers whose activities were governed by federal law[.]" Torres, 122 Hawai`i at 19, 222 P.3d at 426. The ICA thus concluded that "[a]s long as the evidence was obtained by the federal officers in compliance with federal law, Hawai`i courts would not be placing their imprimatur on evidence that was illegally obtained by allowing the evidence to be admitted." Id.
Although Bridges stated that it was applying the exclusionary rule analysis, Bridges' consideration of only the jurisdiction in which the evidence was obtained does not reflect an exclusionary rule approach, but rather, a conflicts of law approach. See Jennifer Friesen, State Constitutional Law § 11-3(d)(3) n. 85.1 (2d ed. Supp. 1999) (citing Bridges as a conflicts of law case). Indeed, the cases Bridges cited to support its conclusion that "the question of whether given conduct is legal is answered by looking to the laws of the jurisdiction in which that conduct was performed, i.e., the situs state[,]" 83 Hawai`i at 196, 925 P.2d at 366, did not apply an exclusionary rule analysis. See United States v. Gerena, 667 F.Supp. 911, 919 (D.Conn.1987) (noting that with respect to state conflicts, under a conflicts of law approach, "states generally determine the legality of alleged police conduct through application of the law of the place where the conduct occurred"); Menefee v. State, 640 P.2d 1381, 1384 (Okla.Crim.App. 1982) (noting, without regard to its exclusionary rule, that "it is well established in federal and other state jurisdictions that the law of the state in which a warrantless arrest takes place determines the validity of the arrest") (citations omitted); accord State v. Cooper, 223 Kan. 175, 573 P.2d 1006, 1008 (1977).
It is manifest that Hawai`i courts are bound to follow the Constitution of Hawai`i. Thus, with regard to judicial integrity, Bridges failed to consider that if state courts admitted evidence in a state prosecution that was obtained in a manner that would be unlawful under our constitution, our courts would necessarily be placing their imprimatur of approval on evidence that would otherwise be deemed illegal, thus compromising the integrity of our courts. This court has acknowledged that our exclusionary rule "recognize[s] that the courts of this State have the inherent supervisory power over criminal prosecutions to ensure that evidence illegally obtained by government officials or their agents is not utilized in the administration of criminal justice through the courts." *1238 Pattioay, 78 Hawai`i at 468, 896 P.2d at 924. Where, then, as in this case, evidence obtained by federal officers is sought to be admitted in a state prosecution, the judicial integrity purpose of the exclusionary rule must be preserved.

B.
According to Bridges, a defendant's privacy rights are to be found within the realm of the situs court jurisprudence inasmuch as a defendant would ordinarily look to that jurisdiction to protect his or her privacy rights and would reasonably expect government conduct to conform to the laws of that jurisdiction. See 83 Hawai`i at 198-99, 925 P.2d at 368-69. This would seem to be logical where the case is tried in such a foreign jurisdiction so that protection would be afforded by the courts of that jurisdiction. However, Bridges also indicated that a defendant's privacy rights may be defined under the Hawai`i Constitution.

[O]ne could argue that evidence obtained in Hawai# i by federal officers in compliance with federal law (and therefore not illegally obtained) but in violation of some more restrictive aspect of Hawai# i law should be suppressed in criminal prosecutions in Hawai# i state courts. See State v. Rodriguez, . . . 110 Or.App. 544, 823 P.2d 1026, 1029-30 ([Or.Ct.App.] 1992) [hereinafter, "Rodriguez I"], rev'd on other grounds [by State v. Rodriguez,] . . . 317 Or. 27, 854 P.2d 399, 403-04 ([Or.] 1993) [hereinafter, "Rodriguez II"]; cf. [T. Quigley, "Do Silver Platters Have a Place in State-Federal Relations? Using Illegally Obtained Evidence in Criminal Prosecutions," 20 Ariz. St. L.J. 285, 321-25 (1988)] ("In the case of evidence illegally seized by federal officers that is admissible in federal court because of an exception to the federal exclusionary rule, states should exclude the evidence consistent with their own exclusionary rule."). In the instant case, however, we need not, and do not, decide that issue.
Id. at 199 n. 15, 925 P.2d at 369 n. 15. Bridges thus appears internally inconsistent as to a reasoned application of our exclusionary rule.[15]
This court has determined that "`[u]nlike the exclusionary rule on the federal level, Hawai`i's exclusionary rule serves not only to deter illegal police conduct, but to protect the privacy rights of our citizens.'" State v. Kahoonei, 83 Hawai`i 124, 131, 925 P.2d 294, 301 (1996) (quoting Lopez, 78 Hawai`i at 445, 896 P.2d at 901); see also State v. Dixon, 83 Hawai`i 13, 23, 924 P.2d 181, 191 (1996) (stating that "article I, section 7 of the Hawai`i Constitution provides broader protection than the [F]ourth [A]mendment to the United States Constitution because it also protects against unreasonable invasions of privacy"); State v. Navas, 81 Hawai`i 113, 123, 913 P.2d 39, 49 (1996) (stating that "article I, section 7 of the Hawai`i Constitution" provides a "more extensive right of privacy . . . than that of the United States Constitution"); State v. Tanaka, 67 Haw. 658, 662, 701 P.2d 1274, 1276 (1985) ("In our view, article I, § 7 of the Hawai`i Constitution recognizes an expectation of privacy beyond the parallel provisions in the Federal Bill of Rights."); Hanson I, 97 Hawai`i at 82, 34 P.3d at 12 ("The Hawai`i Supreme Court has concluded that a person's expectation of privacy under article 1, § 7 of the Hawai`i Constitution is greater than that under the [F]ourth [A]mendment to the United States Constitution.") (Citation omitted.) Because our exclusionary rule is unlike the exclusionary rules of the federal government and some other jurisdictions insofar as it guarantees individual privacy rights, consideration of the Hawai`i Constitution and applicable case law is mandated.
*1239 Consequently, it would seem apparent that the question of whether or not the privacy rights of a defendant who is tried in our courts and under our penal law have been violated, should not be answered by applying the law and constitution of jurisdictions that have deemed privacy rights irrelevant. State v. Snyder, 126 N.M. 168, 967 P.2d 843 (Ct. App.1998), is instructive.[16] In Snyder, the defendant appealed his conviction under New Mexico law for possession of marijuana with intent to distribute, on the ground that the trial court "erred in denying his motion to suppress evidence seized as a result of a warrantless search of his automobile by agents of the United States Border Patrol at a fixed checkpoint near Orogrande, New Mexico." Id. at 844. According to the defendant, the evidence seized by the federal officers violated his rights under article II, section 10 of the New Mexico Constitution,[17] because the State failed to make a particularized showing of exigent circumstances.
In considering whether New Mexico law applied, the New Mexico Court of Appeals acknowledged that "[s]ome state courts have concluded that the application of state exclusionary rules will have little or no deterrent effect on the conduct of federal agents for the simple reason that state constitutions do not control the actions of other sovereigns." Id. at 847 (citations omitted). The Snyder court explained that "[t]his lack of any deterrent effect on agents of another sovereign provides the main reason why these state courts have declined to apply exclusionary rules under their state constitutions to evidence seized by such agents." Id. (citations omitted).
According to the New Mexico court, "[h]owever, unlike the federal exclusionary rule and the laws of some other states, [the courts of New Mexico's] approach to the exclusionary rule under the New Mexico Constitution" "`focuses on the constitutional right of the accused to be free from unreasonable search and seizure.'" Id. (quoting State v. Gutierrez, 116 N.M. 431, 863 P.2d 1052, 1067 (1993)) (other citation omitted). It was declared that, "in order to effectuate such rights under [the New Mexico] Constitution, [the court] must deny the State the use of evidence in a criminal proceeding in state court when that evidence results from an unreasonable search or seizure." Id. at 847-48. Snyder thus concluded that "the requirement of exigent circumstances under [a]rticle II, [s]ection 10 of the New Mexico Constitution applie[d] to the federal border-patrol agent's search of [the d]efendant's truck at a checkpoint in New Mexico" since "the State [sought] to introduce evidence resulting from that search in a New Mexico state court." Id. at 848 (emphasis added).
To reiterate, our exclusionary rule seeks to protect the individual privacy rights of the defendant. Because those rights necessarily stem from our state constitution, our exclusionary rule analysis requires consideration of the defendant's privacy rights as defined by the Hawai`i Constitution and applicable case law. See Davis, 834 P.2d at 1012. Therefore, only upon ascertaining the individual privacy rights of the defendant under the Hawai`i Constitution, would the courts of this state be able to determine whether those rights have been adequately protected.

C.
The final purpose of the exclusionary rule is deterrence. This court has defined deterrence as "the expectation that after evidence is suppressed based on [a] particular police conduct[,] . . . in the future, police officers will refrain from that type of conduct." Bridges, 83 Hawai`i at 199, 925 P.2d at 369. It is plain that the suppression of evidence obtained by Hawai`i law enforcement officers in another jurisdiction, where such evidence was unlawfully seized under the laws or Constitution of Hawai`i, would deter Hawai`i law enforcement officers from engaging in that type of conduct in the future.
*1240 In this instance, however, as the ICA explained, "[b]ecause no Hawai`i law enforcement officer was involved[,] . . . there was no possible misconduct by Hawai`i law enforcement officers to deter." Torres, 122 Hawai`i at 19, 222 P.3d at 426. The ICA thus held that "[a]pplying Hawai`i law to suppress the results of the searches would have little, if any, deterrent effect on the federal officers." Id. However, the application of the Hawai`i exclusionary rule in future cases would deter any federal and state cooperation "to evade state law." Friesen, supra, § 11-3(d)(3). Thus, considerations of judicial integrity, individual privacy, and deterrence require application of Hawai`i's exclusionary rule to Petitioner's motion to suppress.

VI.
We discern other reasons supporting application of our exclusionary rule. If we were to permit our courts to admit evidence illegally obtained under our constitution but legally obtained in another jurisdiction, we would be creating two conflicting standards for the admissibility of evidence. Under one standard, evidence illegally obtained under our constitution, but validly obtained in another jurisdiction, would be admissible against the defendant. Under the other standard, where the evidence was obtained in the very same manner, but within this state, the evidence would be excluded.[18] We see no cogent reason that defendants tried in our state courts should be treated differently depending on where or by whom the evidence sought to be admitted was obtained.
In our view because our constitution applies in the courts of this state, all defendants must be afforded the same constitutional protections. If a defendant is charged and tried in the courts of this state, under Hawai`i criminal law, and subject to punishment thereunder, the defendant should be able to avail himself or herself of the protection afforded by the Hawai`i Constitution. People v. Griminger, 71 N.Y.2d 635, 529 N.Y.S.2d 55, 524 N.E.2d 409, 410 (1988) (stating that, although the evidence was obtained in another jurisdiction, because the "defendant was tried" under "the State's Penal Law," "he [would] be afforded the benefit of [the] State's search and seizure protections"). Therefore, a "state's exclusionary rule should be applied uniformly to evidence, no matter where, and by whose officials, it has been obtained[,]" inasmuch as "admitting the evidence [would otherwise] raise[] troubling prospects of unequal treatment among defendants tried for similar crimes." Friesen, supra, § 11-3(d)(3).
Furthermore, a state's failure to apply its own exclusionary rule to searches by law enforcement officers of other jurisdictions, "runs the risk of inviting withdrawal from joint investigations on the part of the state's police." Quigley, supra, at 321-25. Quigley suggests that with respect to joint investigations, state police officers and prosecutors could wait "until after the critical stages in the investigation are over[,]" i.e., after the evidence had been seized, in order to "gain from any possible unconstitutional actions of the federal officials[.]" Id.; see also Friesen, supra, § 11-3(d)(3) (stating that uniform application of the exclusionary rule to all evidence sought to be admitted in state court would avoid any "covert cooperation to evade state law"); cf. Elkins, 364 U.S. at 221-22, 80 S.Ct. 1437 (stating that, in abolishing the "silver platter doctrine[,]" "[i]f . . . it is understood that the fruit of an unlawful search by state agents will be inadmissible in a federal trial, there can be no inducement to subterfuge and evasion with respect to federal-state cooperation in criminal investigation[; i]nstead, forthright cooperation under constitutional standards will be promoted and fostered").

VII.

A.
Other jurisdictions applying the exclusionary rule analysis have likewise held that, where evidence obtained by federal agents is sought to be admitted in a state court prosecution, the admission of such evidence must *1241 comport with the state constitution. For example, in Rodriguez II, 854 P.2d at 400, the "[d]efendant [was] an alien who had been convicted of possession of a controlled substance" and as a result, was facing deportation. An agent of the United States Immigration and Naturalization Service (INS) learned of the defendant's conviction and obtained an administrative arrest warrant for his arrest. Id. While attempting to execute the warrant, the INS agent obtained permission from the defendant to search the apartment. Id. at 400-01. The search revealed two guns, id. at 401, and when questioned, the defendant "stated that one of the guns was his" and that "the other . . . would have his fingerprints on it." Id.
The defendant was subsequently charged as a former convict in possession of a firearm under Oregon state law. Id. Prior to trial, the defendant moved to suppress both the weapons and his statements, arguing that "the administrative arrest warrant was not supported by oath or affirmation, as required by the Oregon and United States Constitutions, that the arrest was therefore unlawful, and that the guns and statements should be suppressed as the `fruit' of the unlawful arrest." Id. (footnote omitted). The trial court denied the defendant's motion. Id.
On appeal the Oregon Court of Appeals concluded that the defendant's arrest was unlawful because the arrest warrant was not valid under the Oregon Constitution, and the arrest was not a valid warrantless arrest. Id. The Oregon Supreme Court overturned the decision of the court of appeals on other grounds, but likewise held that evidence sought to be admitted in a state prosecution must comport with the Oregon Constitution. Id. at 402.[19] That court stated:
"If the government seeks to rely on evidence in an Oregon criminal prosecution, that evidence must have been obtained in a manner that comports with the protections given to the individual by article I, section 9,[[20]] of the Oregon Constitution. It does not matter where that evidence was obtained (in-state or out-of-state), or what governmental entity (local, state, federal, or out-of-state) obtained it; the constitutionally significant fact is that the Oregon government seeks to use the evidence in an Oregon criminal prosecution. Where that is true, the Oregon constitutional protections apply."
Id. at 403 (quoting Davis, 834 P.2d at 1012) (emphasis added).
Cardenas-Alvarez is of further instruction. In that case, a federal agent seized eighty-five pounds of marijuana at a border patrol checkpoint north of the Mexican border. 25 P.3d at 227. At trial before the New Mexico state court, the defendant moved to suppress the evidence arguing, inter alia, that the evidence was obtained in violation of the New Mexico Constitution. Id. The trial court denied the defendant's motion and that decision was reversed by the court of appeals. On certiorari, the Supreme Court of New Mexico held that although the federal agent did not violate the federal constitution, the seizure of the evidence violated the New Mexico Constitution and, therefore, the evidence should be excluded in state court. Id.
The Supreme Court of New Mexico stated that it found "no mandate in the text of [a]rticle II, [s]ection 10,[[21]] nor in [its] jurisprudence interpreting th[e] clause, to selectively protect New Mexico's inhabitants from intrusions committed by state but not federal governmental actors." Id. at 232. Cardenas-Alvarez explained that, "[u]nlike the private *1242 actors[,] . . . federal agents exercise jurisdiction over New Mexicans and possess the authority to systematically subject [New Mexico] inhabitants to searches, seizures and other interferences." Id. According to the Supreme Court of New Mexico, "[a] federal agent who wields these powers unreasonably commits precisely the sort of `unwarranted governmental intrusion' against which the New Mexico Constitution ensures." Id. As said supra, it was held that New Mexico's exclusionary rule would be applied in the state court "when a federal agent effectuat[ed] such an intrusion[.]" Id.
In Griminger, 529 N.Y.S.2d 55, 524 N.E.2d at 410, federal agents obtained a search warrant from a federal magistrate to search the defendant's home for narcotics based on information provided by an undisclosed informant. The search was executed by federal agents and Nassau County (New York) police officers. Id. "The search produced 10 ounces of marijuana, over $6,000 in cash and drug-related paraphernalia[,]" and the defendant was subsequently charged with criminal possession of marijuana. Id. The issue before the Court of Appeals of New York was whether the two-prong test set forth in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), which New York had "adopted. . . as a matter of State constitutional law," or the totality-of-the-circumstances test adopted by the United States Supreme Court in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), should be employed in determining the sufficiency of an affidavit submitted in support of a search warrant application[,] 529 N.Y.S.2d 55, 524 N.E.2d at 410.
The New York Court of Appeals declined to adopt the Gates test, and reaffirmed the "Aguilar-Spinelli two-prong test[.]" Id. Additionally, the New York Court of Appeals rejected the prosecution's alternative argument that "[f]ederal law should apply . . . since the warrant was issued by a [f]ederal [m]agistrate and executed by [f]ederal agents." Id. at 412. As stated previously, the Griminger court explained that a defendant tried under the state's penal law should be afforded the benefit of the state's "search and seizure protections[.]" Id. (emphasis added).

B.
The previous cases indicate that courts have held, under an exclusionary rule analysis, that evidence obtained by federal officers must have been obtained lawfully under the constitutions of their respective states. It is further observed that courts applying the exclusionary rule analysis have similarly held that where evidence obtained in one state (the situs state) is sought to be admitted in another state (the forum state), such evidence must have been obtained in a manner that comports with the forum state's constitution and laws. For example, People v. Taylor, 804 P.2d 196, 198 (Colo.App.1990), concerned whether the phone records seized by North Dakota officials in North Dakota should be suppressed in a Colorado state court prosecution. In that case, the defendant and her husband owned a bar in Durango, Colorado and were suspected of arranging for others to cause an explosion in another bar located in Durango. Id. In the ensuing investigation, "a search warrant, based upon an affidavit drafted by a Colorado prosecutor, was issued by a North Dakota court to obtain the defendant's telephone records." Id. "Pursuant to the search warrant, North Dakota officials seized the defendant's phone records, . . . and the records were subsequently admitted into evidence" at the defendant's Colorado trial. Id.
On appeal, the Colorado Court of Appeals distinguished precedent in which the Supreme Court of Colorado held that in a state court prosecution, the exclusionary rule did not require suppression of a defendant's confession that was obtained in violation of the Federal Rules of Criminal Procedure. Id. The Colorado Court of Appeals pointed out that, unlike that case, the defendant in the case before it, had "assert[ed] a constitutional violation and not simply the violation of a rule of criminal procedure." Id. That court concluded that "if there was a violation of the defendant's Colorado constitutional rights, then exclusion of the evidence would be mandated even though the evidence may have *1243 been properly seized under the laws of the situs state."[22]Id.
In Stidham v. State, 608 N.E.2d 699, 700 (Ind.1993), the defendant appealed his conviction for, inter alia, murder. The incident giving rise to the defendant's murder charge occurred in Indiana, but the defendant was arrested in Illinois after driving there following the incident. Id. The defendant made incriminating remarks during the course of his arrest. After contacting police officers in Indiana, the Illinois officers gave the defendant Miranda warnings and questioned the defendant, who was seventeen years old. Id.
On appeal, the Indiana Supreme Court noted that under Indiana law, a statement made by a person under the age of eighteen is not admissible unless counsel, the minor's custodial parent, guardian, or guardian ad litem is present, and both the minor and his representative waive the minor's right to remain silent. Id. That court rejected the prosecution's contention that because the statement of the defendant was lawfully obtained in Illinois, i.e., the situs state, it could be admitted in the Indiana court. Id. at 701.
The Stidham court explained that it was "fully aware of the cases . . . wherein other jurisdictions have held that in situations such as this, the statement would be admissible in the prosecuting state." Id. (citations omitted). However, Stidham rejected the holdings in those cases, concluding that the proper inquiry was "the admissibility of [a] statement obtained in Illinois in a prosecution taking place in Indiana." Id. The Indiana Supreme Court ultimately held that the confession made by the defendant in Illinois after he was given his Miranda warnings was inadmissible under the Indiana statute. Id.; see also State v. Camargo, 126 N.H. 766, 498 A.2d 292, 296 (1985) (holding that evidence obtained by a Massachusetts police officer was not admissible in New Hampshire because the "warrantless seizure and subsequent search of the defendant's vehicle were unreasonable under the State Constitution because no exigent circumstances existed to justify a warrantless search"); State v. Platt, 154 Vt. 179, 574 A.2d 789, 791-95 (1990) (analyzing the legality of the seizure of the defendant's car by Massachusetts police officers under the Vermont Constitution).

VIII.
As indicated, Bridges does not reflect a reasoned application of the Hawai`i exclusionary rule. Therefore, it is overruled insofar as it purported to apply the exclusionary rule analysis, but considered only the law and constitution of the situs jurisdiction, reflecting a conflicts of law approach that was expressly rejected. Hence, we must respectfully disagree with the ICA's analysis in the instant case insofar as it relied on Bridges.
The ICA concluded that under Bridges, federal law applied to the searches at issue in the instant case. Torres, 122 Hawai`i at 17, 222 P.3d at 425. The ICA explained that "PHNB is akin to a separate jurisdiction or a situs state for purposes of the Bridges analysis[.]" Id. at 18, 222 P.3d at 425. Thus, according to the ICA, the "Bridges analysis, and the Bridges rationale for applying the law of the situs state support[ed] the application of federal law in this case." Id. As discussed supra, contrary to the ICA's conclusion, our exclusionary rule analysis mandates consideration of the Hawai`i Constitution.
To reiterate, Bridges acknowledged that "one could argue that evidence obtained in Hawai`i by federal officers in compliance with federal law . . . but in violation of . . . Hawai`i law should be suppressed in criminal prosecutions in Hawai`i state courts." 83 Hawai`i at 199 n. 15, 925 P.2d at 369 n. 15. The ICA indicated it was not clear that footnote 15 "contemplated the situation presented here, where the activities of the federal officers took place on a closed military base that was subject to the control of a military commander and was within the . . . jurisdiction of the United States." Torres, 122 Hawai`i at 20, 222 P.3d at 427.
However, Bridges cited to Rodriguez I, *1244 823 P.2d at 1029-30,[23] in support of that statement. In addressing the defendant's argument that his arrest by a federal agent was not valid under the Oregon Constitution because the federal warrant was not supported by oath and affirmation, the Court of Appeals of Oregon stated that its constitution dictates that "all citizens, including criminal defendants, have constitutional rights, and the state may not prove, over objection, any crime with unconstitutionally obtained evidence." Id. at 1029 (internal quotation marks and citation omitted).
Moreover, Rodriguez I stressed that "State constitutional protections deserve at least as much respect as the Oregon Rules of Evidence. For the purpose of prosecuting state offenses in state courts, the validity of an arrest is measured by state standards." Id. According to Rodriguez I, "[f]or the purpose of state prosecutions in state court, an arrest warrant is invalid if it is not supported by oath or affirmation." Id. Bridges' reliance on Rodriguez I reveals that Bridges did refer to circumstances presented in the instant case.

IX.
We therefore conclude that where evidence sought to be admitted in state court is the product of acts that occurred on federal property or in another state, by Hawai`i law enforcement officers or officers of another jurisdiction, such evidence can only be admitted in a state prosecution if obtained in a manner consistent with the Hawai`i Constitution and applicable case law.

X.

A.
Having determined that the Hawai`i Constitution applies to Petitioner's motion to suppress, we next consider whether the searches of Petitioner's vehicle were valid under the Hawai`i Constitution, notwithstanding the fact that they were lawful under the United States Constitution. In the instant case, we agree with the court's conclusion that Petitioner's conduct of driving onto the PHNB demonstrated that he consented to a search of his person and property under his control. See conclusion 5.
"[C]onsent is an exception to and dispenses with the requirement of a warrant." Hanson II, 97 Hawai`i at 76, 34 P.3d at 6 (citations omitted). In Hanson II, when the defendant, scheduled to fly on a Hawaiian Airlines flight, arrived at the Hawaiian Airlines ticket counter to check in, a Honolulu Airport security officer placed the defendant's toolbox through an "x-ray" machine but was unable to identify everything within the toolbox. Id. at 72, 34 P.3d at 2. When the defendant opened the tool box for the security officer, a tan plastic bag wrapped in duct tape was discovered, the contents of which could not be identified. Id. The security officer opened the plastic bag and discovered a second plastic bag. That bag contained a white cardboard box from which a black handgun was recovered. Id. The defendant, who was charged with failing to register a firearm, moved to suppress all evidence obtained as a result of the search. Id.
Although the defendant did not expressly indicate that he consented to a search of his toolbox or the contents therein, this court held that inasmuch as "[c]onsent may also be implied from an individual's words, gestures, or conduct[,]" the defendant had consented to the search of his tool box in voluntarily surrendering it for inspection. Id. at 75, 34 P.3d at 5 (internal quotation marks and citations omitted). Hanson II explained that "implied consent to an airport security search may be imputed from posted notices" and "the nature of airport security measures." Id. (citations omitted). This court additionally held that "[b]ecause the purpose of a security inspection can only be effectuated if the items subject to search can be identified, searches of such belongings must reasonably extend to those containers whose contents cannot be discerned." Id.
*1245 As in Hanson II, in the instant case, there was a clear and visible sign at the entrance of PHNB which stated: "Authorized Entry Onto This Installation Constitutes Consent To Search Of Personnel And The Property Under Their Control. Internal Security Act of 1950 Section 21; 50 U.S.C. 797." Finding 6. Any person who, after reading the sign, decided not to consent to a search of his or her person or property, could turn around and leave without having his or her person or property searched. See finding 8. The guard shack, which a person would have passed in order to gain entrance to the base, was located approximately 50 feet beyond the sign, giving a person ample opportunity to turn around if he or she did not want to be subjected to a search of his or her person or property. See finding 9.
According to Petitioner, although there was a sign posted 50 feet before the entrance to PHNB, he was not given the opportunity to decide whether to enter PHNB and turn around at the guard shack because Officer Aguilar "waved him down as he was entering the gate and then stopped his car just after the guard shack." However, in his Application, Petitioner did not challenge any of the findings of the court, and, therefore, such findings are binding on this court. In any event, there is nothing to suggest that Petitioner indicated to Officer Aguilar in any way, that he did not want to enter PHNB and instead, wished to turn around at the guard shack. Officer Aguilar saw Petitioner in his vehicle, waiting to enter PHNB, and Petitioner did in fact enter PHNB. See findings 16, 17. It was only after Petitioner entered PHNB that Officer Aguilar motioned for him to stop his vehicle, and only after he was informed that NCIS wanted to talk to him about the incident that Petitioner began to struggle to restart the vehicle, in a seeming attempt to exit PHNB. See finding 17, 18.
Inasmuch as "[c]onsent may . . . be implied from an individual's words, gestures, or conduct[,]" Hanson II, 97 Hawai`i at 75, 34 P.3d at 5, we conclude that Petitioner's consent to the search of his vehicle may be implied from his act of driving past the guard shack and onto PHNB, and imputed from the posted notice indicating that entry onto PHNB constituted consent to a search.[24]

B.
Petitioner noted that Sergeant Rozkiewicz and Officer Aguilar testified there were search directives for random searches. We find federal search directives irrelevant in this case inasmuch as we conclude that the inspection of Petitioner's vehicle was valid based on Petitioner's implied consent to such search.
Also, Petitioner does not point to any directive alleged to have been violated. The court's unchallenged finding indicates that "[a]fter moving the vehicle, [Sergeant] Rozkiewicz followed base police procedures in securing the vehicle, which required police to check a vehicle that was going to be left unattended on base, for flammable or volatile substances such as gasoline, kerosene and explosives." Finding 23.[25] For the reasons *1246 set forth supra, we likewise conclude that the inspection of Petitioner's vehicle by Sergeant Rozkiewicz was not unreasonable under the Hawai`i Constitution.

XI.
Having determined that the inspection of Petitioner's vehicle by Sergeant Rozkiewicz was not unreasonable under the Hawai`i Constitution, we consider the legality of the second search of Petitioner's vehicle. In his Application, Petitioner's only argument with respect to the second search is that it was "tainted" by the first search, i.e., the inspection of Petitioner's vehicle by Sergeant Rozkiewicz. According to Petitioner, "[i]f the first search was unconstitutional, [Respondent] must show that the subsequent search is not the fruit of the prior search" or at least, "the dissipation of the taint." (Internal quotation marks and citation omitted.) Petitioner maintains that because "the affidavit submitted in support of the Command Authorization relied heavily on [Sergeant] Rozkiewicz's statements regarding his observations during the first search[,]" the search conducted pursuant to the Command Authorization "was still tainted by the prior illegal search and was therefore invalid." (Citation omitted.)
With respect to Petitioner's argument that the second search was the "fruit" of or tainted by the inspection of his vehicle by Sergeant Rozkiewicz, because we have held that the first search did not violate the Hawai`i Constitution, it follows that the evidence obtained pursuant to the Command Authorization was neither the "fruit" of an unlawful search, nor tainted by the inspection of Petitioner's vehicle by Sergeant Rozkiewicz. Alternatively, by entering onto PHNB, Petitioner consented to the second search of his vehicle as well as the inspection of his vehicle by Sergeant Rozkiewicz.

XII.
Petitioner's third question in his Application contends that the ICA's decision was inconsistent with Gant, ___ U.S. at ___, 129 S.Ct. at 1714, and that the ICA gravely erred in determining that other exceptions to the warrant requirement applied in the instant case. It is observed that Gant has raised some questions about the viability of the Supreme Court's holding in New York v. Belton, 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), "that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." (Footnotes omitted.)
In Gant, the defendant "was arrested for driving [with] a suspended license, handcuffed, and locked in a patrol car before officers searched his car and found cocaine in a jacket pocket." ___ U.S. at ___, 129 S.Ct. at 1714. The Court held "that Belton does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle." Id. Gant additionally "conclude[d] that circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." Id.
*1247 As indicated previously, we affirm the ICA's decision insofar as it upheld the searches of Petitioner's vehicle as valid under federal law and the United States Constitution. However, we observe that the ICA did not determine that any of the searches of Petitioner's vehicle were justified on the ground that the search was incident to a lawful arrest and so did not consider Gant. Therefore, Gant is not applicable to the instant case. Because we have concluded that upon entering PHNB Petitioner impliedly consented to a search of himself and his property, we need not reach the issues raised in Gant.

XIII.
We respectfully disagree with objections raised by the concurring and dissenting opinion (hereinafter, dissent or dissenting opinion).

A.
With respect to judicial integrity, the dissent suggests that the integrity of our courts would not be tarnished by admitting evidence obtained in another jurisdiction so long as it was obtained in a manner that comported with the laws of that jurisdiction. Dissenting opinion at 1251-52. However, as stated, supra, inasmuch as the courts of this State are bound to uphold the Hawai`i Constitution, the admission of evidence obtained in violation thereof would diminish the integrity of our courts.

B.
With respect to individual privacy, the dissent states "that the Hawai`i Constitution simply does not apply everywhere, so [the] privacy [of a defendant is] best defined by the laws of the situs jurisdiction." Id. at 1253. We do not hold that the Hawai`i Constitution applies everywhere. But it does apply in the courts of this State. As discussed previously, determination of a defendant's privacy rights, when prosecuted in a Hawai`i state court, must be defined under the constitution of this State, and not under the constitutions of jurisdictions whose exclusionary rules do not protect against invasions of privacy. Furthermore, we discern no reason why all defendants prosecuted in our state courts should not be afforded the same constitutional protections. See Griminger, 529 N.Y.S.2d 55, 524 N.E.2d at 412.

XIV.

A.
The dissent relies heavily on Gerena for the proposition that the law of the jurisdiction in which the government conduct took place should govern the admissibility of evidence in our state courts. See dissenting opinion at 1251-52.[26] In Gerena, the defendants filed a number of motions challenging the legality of the federal government's surveillance activities. See Gerena, 667 F.Supp. at 913. The U.S. district court ultimately ruled that the law of the circuit in which the surveillance took place governed the defendants' motions. Id. at 927.
Gerena did not engage in an exclusionary rule analysis, but rather, considered several factors in determining which federal circuit's interpretation of the federal surveillance statute should govern the case before it. See id. at 914-15. Hence, Gerena is fundamentally different from the instant case inasmuch as there was no actual conflict of laws between two jurisdictions. Gerena dealt with varying interpretations of the same federal law by two federal circuits. In other words, both circuits were subject to the same law.[27] *1248 Moreover, any conflict between the lower circuit courts of appeal would ultimately be resolved by the United States Supreme Court.
Gerena also noted that federal electronic surveillance law is "designed to protect against illegitimate intrusions into privacy before they can occur." Id. at 916 (emphasis in original). It was explained that federal electronic surveillance law "suggests[ ] [that] responsibility vests in the local supervising authority to see that statutory guidelines are observed and that fundamental rights are not disregarded" because "little is available to truly redress the grevious wrong that is suffered by one whose privacy has been unreasonably intruded upon" inasmuch as the federal "suppression remedy available to the forum [court] is designed predominantly to deter future wrongful police conduct, not to remedy any past transgression." Id.
As stated before, unlike the federal exclusionary rule, the Hawai`i exclusionary rule serves the fundamental purpose of protecting privacy rights. Lopez, 78 Hawai`i at 446, 896 P.2d at 902. In that regard, our rule is remedial insofar as, unlike the federal rule, it mitigates invasions of privacy after they occur via the suppression of evidence. In contrast to Gerena, under our exclusionary rule, courts do have the power to "redress the grevious wrong that is suffered by one whose privacy has been unreasonably intruded upon[,]" Gerena, 667 F.Supp. at 916, by excluding evidence unlawfully obtained under the Hawai`i Constitution.
Obviously, our constitution does not control the conduct of officers of other jurisdictions; however, as noted, it does apply in the courts of this state.[28] Here, we are concerned with the admissibility of evidence, which the prosecution seeks to use in making its case against a defendant. Where a defendant is charged and prosecuted in a Hawai`i state court, the situs state and the officers thereof are not adversely affected inasmuch as a decision in this jurisdiction does not bind the courts or control the conduct of the officers of the situs state.
Consequently, in the instant case, the Hawai`i Constitution could not control the conduct of the federal officers on a closed military base. While the court had a duty to ensure the evidence was obtained in a manner that complied with the federal constitution, courts of this state serve as judicial officers of a sovereign power, the State of Hawai`i. See Moran v. State, 644 N.E.2d 536, 538 (Ind.1994) (holding that the Indiana constitutional provisions did not apply to the issuance of a search warrant by a federal magistrate, but because "Indiana judges serve as judicial officers of a sovereign power, the State of Indiana[,]" the Indiana Constitution did apply in that appeal and to the trial court's determination "of whether the prosecution should be permitted to convict upon evidence that was that warrant's product"). Therefore, where the government chooses to prosecute a defendant in state court, our judges, as a separate and distinct dimension of their offices, have an obligation to determine whether evidence used therein, violates the Hawai`i Constitution, which they are bound to uphold. See id. (stating that, as "a separate and distinct dimension of their offices[,]" Indiana judges "must respect and adjudicate state constitutional claims when made").

B.
The dissent cites to a line of cases stating that other state courts faced with choice-of-law questions have applied the law of the situs jurisdiction. See dissenting opinion at 1252 n.3. Inasmuch as we apply the exclusionary rule, those cases are distinguishable from the instant case.[29] As to the other *1249 cases cited to by the dissent, none of the exclusionary rules of those jurisdictions protect individual privacy rights.[30]
The dissent suggests that although Bridges cited to cases that did not adopt an exclusionary rule analysis, that factor is not relevant inasmuch as those cases indicate that other courts "have come to the reasonable conclusion that the forum jurisdiction's judicial integrity remains intact when admitting evidence from situs jurisdictions if that evidence was legally obtained according to the situs jurisdiction's law." Id. at 1252. The dissent also finds the fact that those jurisdictions consider different or fewer factors under their exclusionary rules "does not diminish the guidance they provide the court." Id.
However, it would seem beyond dispute that the exclusionary rule analysis requires consideration of the specific purposes served by Hawai`i's rule. See Bridges, 83 Hawai`i at 195, 925 P.2d at 365 (stating that "[u]nder an exclusionary rule analysis the court first identifies the principles to be served by the exclusionary rule, and then evaluates how the principles would be served by exclusion" (brackets in original)). Because we have held that the exclusionary rule analysis is superior to a conflicts of law approach, that is often used to resolve conflicts of law issues within the civil context, see id., cases cited by Bridges that employed a conflicts of law approach are not germane. Cf. Mikelson v. United Servs. Auto. Ass'n, 107 Hawai`i 192, 200, 111 P.3d 601, 609 (2005) (noting that Bridges does not support a conflicts of law analysis inasmuch as Bridges held that the exclusionary rule analysis was applicable in a criminal prosecution in Hawai`i).
State v. Engel, 249 N.J.Super. 336, 592 A.2d 572 (N.J.Super.Ct.App.Div.1991), cited by the dissent, highlights the reasons we must reject the dissent's approach. In Engel, the defendants had been convicted in New Jersey of conspiracy and murder. Id. at 576. On appeal, the defendants argued, inter alia, that the trial judge had erred in denying their motion to suppress automobile toll records obtained from a company in New York without a warrant. Id. at 585. Although the seizure of the toll records was lawful under New York and federal law, "the *1250 seizure would have violated the New Jersey Constitution if it had occurred in [New Jersey]." Id. at 586. The Superior Court of New Jersey, Appellate Division, stated that its exclusionary rule serves to (1) "deter unlawful police conduct[,]" (2) promote "judicial integrity[,]" and (3) "indicate the importance of an individual's state constitutional right to be free from unreasonable search and seizure." Id. at 587. Nevertheless, with respect to judicial integrity, Engel contended that because the good faith of the officers who seized the toll records in New York could not "be doubted[,]" that court would not be "lending [ ] aid to a lawless venture" by "permitting the admission of the seized evidence[.]" Id. It was determined "that no citizen's individual constitutional rights fail of vindication because there has been no violation of the law of the state where the seizure occurred." Id. Finally, Engel concluded that "exclusion would serve no deterrent effect." Id. at 588.
As indicated previously, because our exclusionary rule is remedial in nature, the courts of this State must remedy what would amount to a violation of the Hawai`i Constitution. In that regard, Engel's conclusion as to privacy rights is particularly troubling. The Engel court admitted evidence of the toll records obtained without a warrant, although the Supreme Court of New Jersey had held that "telephone toll records can be obtained only by a warrant issued upon a finding of probable cause." Id. at 586 (citing State v. Hunt, 91 N.J. 338, 450 A.2d 952 (1982)).
We choose not to endorse an approach that would provide a defendant with less protection under the Hawai`i Constitution depending solely on where or by whom the evidence was obtained. As noted before, "[s]ince [Petitioner was] tried for crimes defined by th[is s]tate's Penal Law, we can discern no reason why he should not also be afforded the benefit of our [s]tate's search and seizure protections." Griminger, 529 N.Y.S.2d 55, 524 N.E.2d at 410. Moreover, "constitutional rights [necessarily] fail of vindication[,]" Engel, 592 A.2d at 588, where evidence unconstitutionally obtained under the provisions of the Hawai`i Constitution is admitted in the courts of this State.

C.
The dissent also cites In re Teddington, 116 Wash.2d 761, 808 P.2d 156 (1991). See dissenting opinion at 1254. There, the Supreme Court of Washington held that the Washington Constitution was not implicated where evidence was obtained on federal property by federal officers. Id. at 163. However, that case is distinguishable since that court did not follow an exclusionary rule approach. See supra. Teddington specifically said that the evidence was admissible because "`[n]either state law nor the state constitution can control federal officers' conduct.'" Id. at 162 (quoting State v. Bradley, 105 Wash.2d 898, 719 P.2d 546 (1986)). In this case, the Hawai`i Constitution is not invoked to control the conduct of federal officers. Rather, our focus is on the guarantees in the Hawai`i Constitution insofar as they apply to the admission of evidence. Therefore, where the State seeks to offer evidence in a state criminal proceeding, the Constitution of Hawai`i must govern the admissibility of such evidence.[31]

XV.
Based on the foregoing, we correct the ICA's opinion insofar as it concluded that federal law alone governed Petitioner's motion to suppress. We affirm the December 5, 2006 order of the court denying Petitioner's motion to suppress under federal law and the Hawai`i Constitution. The January 7, 2010 Judgment of the ICA is accordingly affirmed.
Concurring and Dissenting Opinion by NAKAYAMA, Acting C.J.
I respectfully dissent from the holding that Hawai`i law, rather than federal law, applies to petitioner's suppression motion. I would *1251 follow the analysis this court outlined in State v. Bridges, 83 Hawai`i 187, 925 P.2d 357 (1996), and hold that the evidence obtained by federal agents on federal property in this case is admissible.[1]
In Bridges, this court considered whether Hawai`i constitutional standards govern a motion to suppress evidence obtained by Hawai`i and California state agents in California (the situs state) when offered in a criminal proceeding before a court in Hawai`i (the forum state). I agree with the majority's determination that this exclusionary rule analysis from Bridges guides our opinion today. However, the majority characterizes the Bridges opinion as not "reflect[ing] a reasoned application of the Hawai`i exclusionary rule," and overrules all but the articulation of the exclusionary rule test. Majority opinion at 1243. As explained below, I believe the Bridges case to be well-reasoned. Thus, I would follow the analysis in Bridges, which leads to applying federal law in this case.
In Bridges, defendant sought suppression of evidence obtained by Hawai`i and California agents during a sting drug investigation in California. 83 Hawai`i at 189, 925 P.2d at 359. We began by noting that the evidence was procured in apparent compliance with California and federal law. Id. at 197, 925 P.2d at 367. While it was the first case on the issue in Hawai`i, we noted that other states have typically decided such cases following one of two approaches: the conflicts of law approach, or exclusionary rule analysis. Id. at 195, 925 P.2d at 366. Courts applying the conflicts of law approach look to "the domicile of the parties, the situs of the transactions, and the interest of the forum in applying its own law."[2]Id. (quoting B. Latzer, The New Judicial Federalism and Criminal Justice: Two Problems and a Response, 22 Rutgers L.J. 863, 873 (1991)). Courts following the exclusionary rule analysis determine the principles motivating the exclusionary rule, and then evaluate suppression in light of those principles. Id. This court held that the exclusionary rule analysis is the better approach. Id. We articulated three factors to consider in the exclusionary rule analysis governing these cases: (1) judicial integrity, (2) individual privacy, and (3) deterrence. Id. I now consider each factor in turn.

A. Judicial Integrity
The first prong of the exclusionary rule analysis requires considering the impact of admitting the evidence on the integrity of the state's judicial system. Id. at 196, 925 P.2d at 366. In Bridges we determined that the integrity of Hawai`i courts would not be negatively affected by admitting evidence obtained in another jurisdiction, provided that the evidence was obtained legally under the situs jurisdiction's law. Id. at 197, 925 P.2d at 367. For support, the court cited a federal case U.S. v. Gerena, 667 F.Supp. 911 (D.Conn.1987), among other cases.
In Gerena, the United States District Court for the District of Connecticut, which *1252 sits in the second circuit, considered the admissibility of evidence procured in the first circuit. 667 F.Supp. 911, 912. Following a multi-factor test considering the many implications of the ruling, the court held that first circuit law applied in analyzing surveillance undertaken in the first circuit. 667 F.Supp. at 913.
The majority opinion discounts our reliance on Gerena for two main reasons. First, the majority claims that Gerena's analysis is "fundamentally different" because the question considered the circuits' differing interpretations of the same federal law, and "there was no actual conflict of laws between two jurisdictions." Majority opinion at 1247. I disagree. That the jurisdictions interpreted the same statute does not remove this case from characterization as a choice of law case; the interpretations among the two circuits differed and the court had to determine which interpretation to follow. Second, the majority distinguishes Gerena because federal courts do not apply the same exclusionary rule test as we do in Hawai`i. Majority opinion at 1247-48. That federal courts consider more factors in their analysis does not diminish the guidance they provide the court concerning this state's judicial integrity factor. Even if the tests are not identical, cases from other jurisdictions show that other courts have come to the reasonable conclusion that the forum jurisdiction's judicial integrity remains intact when admitting evidence from situs jurisdictions if that evidence was legally obtained according to the situs jurisdiction's law. In fact, the utilization of the situs jurisdiction's law in analyzing admissibility of evidence procured outside the forum jurisdiction is followed in many of our sister states,[3] as well as in federal courts considering evidence procured in other circuits.[4] I do not believe that all of these courts compromise their judicial integrity by admitting this evidence.
Today, the majority writes that

Bridges failed to consider that if state courts admitted evidence in a state prosecution that was obtained in a manner that would be unlawful under our constitution, our courts would necessarily be placing their imprimatur of approval on evidence that would otherwise be deemed illegal, thus compromising the integrity of our courts.
Majority opinion at 1237. However, as this court wrote in Bridges,
The "judicial integrity" purpose of the exclusionary rule is essentially that the courts should not place their imprimatur on evidence that was illegally obtained by allowing it to be admitted into evidence in a criminal prosecution. Of course, when evidence is not obtained illegally, "no loss of judicial integrity is implicated in a decision to admit the evidence."
83 Hawai'i at 196, 925 P.2d at 366 (quoting State v. Minter, 116 N.J. 269, 561 A.2d 570, 571 (1989)). In my opinion, this court considered and unanimously rejected this argument only 15 years ago in Bridges. Accordingly, I would follow precedent to hold that admitting the evidence in this case does not diminish the integrity of our courts.

*1253 B. Individual Privacy
I also disagree with the majority's rereading of the individual privacy factor of the exclusionary analysis. The majority finds the logic of Bridges to be "internally inconsistent." Majority opinion at 1238-39. I see no such inconsistency. In Bridges, we cited Gerena for the idea that a defendant's notions of individual privacy derive from the location in which the defendant is physically present, and not from any prescient conception of the jurisdiction in which he or she may eventually be on trial. 83 Hawai`i at 199, 925 P.2d at 369 ("the scope of the defendants' rights, as they might expect to exercise them on a day-to-day basis, is to be found within the realm of [the situs circuit] jurisprudence.") (quoting Gerena, 667 F.Supp. 911, 917). The majority finds this to be inconsistent with a hypothetical contemplated in a footnote of that section. Majority opinion at 1238. In that footnote, we wrote:
Under this interpretation of the individual privacy rationale of our exclusionary rule, one could argue that evidence obtained in Hawai`i by federal officers in compliance with federal law (and therefore not illegally obtained) but in violation of some more restrictive aspect of Hawai`i law should be suppressed in criminal prosecutions in Hawai`i state courts.
83 Hawai`i 187, 199 n. 15, 925 P.2d at 369 n. 15 (emphasis added). Setting aside the fact that the footnote is a hypothetical discursion and not a part of our analysis, there remains no inconsistency between the two ideas. The Hawai`i Constitution will not abide admission of evidence that was obtained in violation of a criminal defendant's privacy rights. However, we recognize that the Hawai`i Constitution simply does not apply everywhere, so those privacy rights are best defined by the laws of the situs jurisdiction. In Bridges, the evidence was obtained in California, so we held that California law determined admissibility; in the hypothetical of footnote 15, the evidence was obtained in Hawai`i, so we theorized that Hawai`i law may govern, even though federal agents gathered the evidence.
This case considers admissibility of evidence that was obtained by federal agents on federal property. The Hawai`i Constitution is a capacious document, but I do not believe that an individual has a reasonable expectation that its protections extend to searches conducted beyond its borders. The facts of this case illustrate my point. It is undisputed that the searches of Torres's car "were conducted by federal law enforcement officers on [Pearl Harbor Naval Base], a closed military base that is enclosed by fences and is within the special maritime and territorial jurisdiction of the United States." State v. Torres, 122 Hawai`i 2, 18, 222 P.3d 409, 425 (App.2009) (brackets added). Moreover, the ICA observed that (1) "[v]isitors to [Pearl Harbor Naval Base] are warned that they are entering `U.S. NAVY PROPERTY[,]'"[5] (2) Pearl Harbor Naval Base "is subject to the control of a military commander who has the authority to restrict entry onto the base," and (3) the base "has its own federal police force." Id. In light of these facts, the belief that the Hawai`i Constitution governs privacy rights on the base is unreasonable. Thus, with regard to the individual privacy factor of the exclusionary analysis, I would follow the logic of Bridges to hold that the contours of Torres's right to privacy should be defined according to the federal law that governs those present on Pearl Harbor Military Base.

C. Deterrence
As we described in Bridges, "`[d]eterrence' refers to our expectation that after evidence *1254 is suppressed based on particular police conduct in one case, in the future, police officers will refrain from that type of conduct and will instead act in a manner that would not lead to suppression of evidence." 83 Hawai`i at 199, 925 P.2d at 369. As this court noted in Bridges, and as today's majority opinion readily concedes, it is unlikely that our exclusion of relevant evidence will deter federal agents from violating Hawai`i constitutional law. Id.; Majority opinion at 1239-40. Thus, the analysis of this factor is straightforward, and weighs heavily against applying the exclusionary rule in this case.
The Washington Supreme Court reached the same conclusion in a factual scenario very similar to that before the court today. In In re Teddington, defendant served in the Army at Fort Lewis. 116 Wash.2d 761, 808 P.2d 156, 157 (1991). He was arrested for murder, and his commanding officer at the base ordered that his personal property be inventoried, as was standard military procedure. Id. While gathering defendant's effects, the platoon sergeant found inculpatory evidence, which was later admitted at trial in Washington state courts. Id. On appeal before the Washington Supreme Court, defendant argued that the evidence should have been suppressed, but the court held that "[e]vidence which is lawfully obtained by federal officers pursuant to federal law is admissible in Washington State criminal proceedings even if seizure of evidence in a similar manner by state officials might violate the State of Washington Constitution." Id. at 161. Again, I recognize that the test applied by the Washington State Supreme Court is different than the test we apply here in Hawai`i, but that court's analysis nonetheless may instruct this court's analysis.
I would follow this court's decision in Bridges, and hold that Hawai`i courts must analyze the admissibility of evidence obtained by federal agents on federal property under federal law in this case.
NOTES
[1] The opinion was authored by Chief Judge Craig H. Nakamura and joined by Associate Judges Alexa D.M. Fujise and Katherine G. Leonard.
[2] The Honorable Michael A. Town (now retired) presided over the relevant proceedings.
[3] HRS § 707-701.5, in effect at the time, stated:

Murder in the second degree. (1) Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
(2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.
[4] HRS § 706-660.1 provided in pertinent part:

Sentence of imprisonment for use of a firearm, semiautomatic firearm, or automatic firearm in a felony. (1) A person convicted of a felony, where the person had a firearm in the person's possession or threatened its use or used the firearm while engaged in the commission of the felony, whether the firearm was loaded or not, and whether operable or not, may in addition to the indeterminate term of imprisonment provided for the grade of offense be sentenced to a mandatory minimum term of imprisonment without possibility of parole or probation the length of which shall be as follows:
(a) For murder in the second degree and attempted murder in the second degree-up to fifteen years[.]
[5] Article I, section 7 of the Hawai`i Constitution provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches, seizures and invasions of privacy shall not be violated[.]"
[6] The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
[7] The Fourteenth Amendment to the United States Constitution states in pertinent part that

[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
[8] In its Application, Respondent presented the question of whether the ICA "gravely erred when it found that the circuit court had abused its discretion in admitting Agent Robbins's lay opinion testimony regarding the revolver found in [Petitioner's] car[.]" The ICA concluded that the court "abused its discretion in admitting Agent Robbins's time-frame testimony" that the revolver recovered from Petitioner was fired "within the same day, probably about eight hours or so[]" because (1) Respondent "did not set forth a sufficient foundation" for the admission of the testimony as a lay opinion, and (2) Agent Robbins's opinion "required expert testimony[,]" and (3) Respondent "did not satisfy the foundational requirements for [the] admission of . . . [Agent Robbin's] testimony as expert testimony." Torres, 122 Hawai`i at 28, 222 P.3d at 435. The ICA thus concluded that Respondent "did not satisfy the foundational requirements for [the] admission" of Agent Robbin's "time-frame testimony as expert testimony." Id.
[9] Petitioner contends that his incriminating statements to Davis were inadmissible because Respondent failed to introduce sufficient independent evidence of the trustworthiness of the statements. However, we agree with the ICA that Respondent did introduce independent evidence corroborating the essential facts set forth in Petitioner's statements to Davis. Torres, 122 Hawai`i at 12-13, 222 P.3d at 419-20.
[10] As indicated infra, we review the ICA's analysis with regard to the second question presented in his Application.
[11] We conclude that Petitioner's third question must be answered in the negative. As indicated, we uphold that part of the ICA's opinion which affirmed the legality of the searches of Petitioner's vehicle under federal law. Moreover, as discussed infra, Gant is not relevant to the instant case.
[12] "The freedom of individuals from unreasonable searches and seizures is a fundamental guarantee provided for by the Fourth Amendment to the United States Constitution and [a]rticle I, [s]ection 5 of the Constitution of the State of Hawaii." State v. Abordo, 61 Haw. 117, 120, 596 P.2d 773, 775 (1979). The "exclusionary rule" effectuates the right protected by article I, section 5 of the Hawai`i Constitution, by "conferr[ing] upon defendants in . . . criminal prosecutions[,] the right to have excluded from trial evidence which has been obtained by means of an unlawful search and seizure." Id. (citations omitted).
[13] The Supreme Court had once held that evidence unlawfully obtained by state officers was admissible in federal court via a "silver platter." Lustig v. United States, 338 U.S. 74, 78-79, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949). The Court had reasoned that evidence obtained by state officers was outside the Fourth Amendment constitutional inquiry. See Weeks v. United States, 232 U.S. 383, 398, 34 S.Ct. 341, 58 L.Ed. 652 (1914). This doctrine had been referred to as the "silver platter doctrine." Notably, in Elkins v. United States, 364 U.S. 206, 223, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), the Supreme Court abolished this doctrine as unconstitutional. The Court held that "evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible. . . in a federal criminal trial."

The "reverse silver platter" doctrine refers to instances where state courts admit evidence obtained by federal officers in a manner that would not violate federal authority, but would violate their own state law or the state constitution. See Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 1.5(c), 175 (4th ed. 2004).
[14] New Mexico Constitution, article II, section 10, provides as follows:

The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the persons or things to be seized, nor without a written showing of probable cause, supported by oath or affirmation.
[15] As indicated, this court has said that Hawai`i's exclusionary rule serves to protect the privacy rights of persons within Hawai`i's jurisdiction, not only to deter illegal police conduct. See Lopez, 78 Hawai`i at 445, 896 P.2d at 901. Thus, if, as Bridges stated, the exclusionary rule analysis looks to the laws of the jurisdiction in which the conduct occurred, our courts would not need to consider whether the defendant's individual privacy rights had been compromised when such evidence is introduced in a Hawai`i state prosecution. Hence, Bridges' consideration of only the foreign state's law rendered the application of the exclusionary rule analysis in that case internally inconsistent, insofar as Bridges stated that individual privacy rights under the Hawai`i Constitution should be considered.
[16] It may be noted that applying the laws of the situs may be difficult, if not impossible, where the jurisdiction has no law that could resolve the issues raised in a defendant's motion to suppress inasmuch as the courts of this state have no authority to declare the laws of another jurisdiction.
[17] See supra note 14 for the text of article II, section 10.
[18] This may be particularly problematic where the prosecution is trying two or more defendants as co-defendants, and where the evidence is admissible against one defendant, but inadmissible against the other.
[19] The Oregon Supreme Court ultimately determined that the evidence was admissible under the Oregon Constitution because the defendant "consented to the search that uncovered the guns, and that consent was not obtained by exploitation of the unlawful conduct[.]" 854 P.2d at 405.
[20] Article I, section 9 of the Oregon Constitution provides:

No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized.
Id. at 402.
[21] See supra note 14 for the text of article II, section 10 of the Mexico Constitution.
[22] That court ultimately concluded that the telephone records were obtained lawfully under the Colorado Constitution. See Taylor, 804 P.2d at 198-99.
[23] The Oregon Supreme Court's decision, which overruled the decision of the Court of Appeals of Oregon on other grounds, was discussed supra.
[24] Federal courts have likewise held that consent to a search of one's vehicle may be implied from entry onto a closed military base. See Morgan v. United States, 323 F.3d 776, 778 (9th Cir.2003) (stating that because military bases "often warn of the possibility of search as a condition to entry, a warrantless search of a person seeking to enter a military base may be deemed reasonable based on the implied consent of the person searched"); Jenkins, 986 F.2d at 79 (stating that "[c]onsent is implied by the totality of all the circumstances[,]" including "[t]he barbed-wire fence, the security guards at the gate, the sign warning of the possibility of search, and a civilian's common-sense awareness of the nature of a military base[,]" all of which "combine to puncture any reasonable expectations of privacy for a civilian who enters a closed military base[]") (internal quotation marks and citations omitted); United States v. Ellis, 547 F.2d 863, 864 (5th Cir. 1977) ("Consent to search a motor vehicle while on board a Naval Air Station was validly obtained through issuance, acceptance and display of a visitor's pass" and therefore, "marijuana disclosed by a warrantless search made pursuant to this consent was legally obtained"); United States v. Mathews, 431 F.Supp. 70, 73 (D.C.Okla.1976) (concluding that because there were signs at the entrance of the air force base indicating the property or personnel within the control of those entering the base may be subject to search, "defendants had consented to their vehicle and persons being searched by entering the Military Reservation").
[25] Federal courts generally uphold searches that take place on closed military bases as reasonable, without regard as to whether conducted pursuant to federal search directives or procedures, and even in the absence of any particularized suspicion. Jenkins, 986 F.2d at 78 (stating that "searches on closed military bases have long been exempt from the usual Fourth Amendment requirement of probable cause") (citations omitted); Ellis, 547 F.2d at 866 (stating that "[t]he right to make a search [on a closed military base] pursuant to [] consent does not turn on the presence of probable cause"); United States v. Rogers, 549 F.2d 490, 493 (8th Cir.1976) (upholding a warrantless search of the defendant's vehicle based on exigent circumstances, and explaining that "because the search occurred on . . . a closed military base, there is even less reason to question the propriety of the search"); United States v. Vaughan, 475 F.2d 1262, 1264 (10th Cir.1973) (stating that once the defendant entered the closed military base, "a search conducted without probable cause and without consent could be proper" and "the submission to search could be imposed as a valid condition to gaining access to the base"); United States v. Grisby, 335 F.2d 652, 654-55 (4th Cir.1964) (stating that "[t]he authority . . . of a military picket to search any automobile entering a military reservation is widely recognized and has been judicially upheld").
[26] The same considerations for rejecting Gerena as controlling apply to the federal cases cited in note 4 of the dissent. See dissenting opinion at 1252.
[27] See Hartline v. Sheet Metal Workers' Nat'l. Pension Fund, 201 F.Supp.2d 1, 3 (D.D.C.1999) (explaining that "state laws are in substance different whereas in cases brought under federal law the law is uniform across the nation but is subject only to the differing interpretations of the nation's circuit courts"). Furthermore, the two federal courts in Gerena both fell within the same federal jurisdiction and were courts at the same level. See In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1175 (D.C.Cir.1987) (stating that "`the federal courts comprise a single system in which each tribunal endeavors to apply a single body of law'") (quoting H.L. Green Co. v. MacMahon, 312 F.2d 650, 652 (2d Cir. 1962)) (brackets omitted).
[28] It is additionally observed that in most cases involving conflicts of law issues, both the officials of the forum state and the situs state are aware of the potential involvement of the other jurisdiction. See, e.g., Bridges, 83 Hawai`i at 189, 925 P.2d at 359 (where the Honolulu Police Department "contacted the La Habra Police Department and the Los Angeles Police Department to coordinate a `sting' operation"). Thus, realistically, officers of the forum state and the situs state already know that the individual being investigated may be tried in the courts of the forum state and under the laws thereof.
[29] In D'Antorio v. State, 837 P.2d 727, 731 (Alaska Ct.App.1992), the Alaska Court of Appeals did determine that a search incident to an arrest in Ohio and a subsequent inventory search was governed by Ohio law. However, it also concluded that another search of the defendant's property in Ohio was governed by Alaska law because (1) it "was an investigation by an Alaska State Trooper who was investigating charges which arose in Alaska"; and (2) "Alaska has the most significant relationship to and governmental interest in [the Alaska State Trooper's] activities in Ohio." Id. The foregoing does not reflect an exclusionary rule analysis, but rather, a conflicts of law approach, which this court had rejected.

In Frick v. State, 634 P.2d 738, 740 (Okla.Crim. App.1981), the Court of Criminal Appeals of Oklahoma stated that Oklahoma law prohibits wiretapping "without lawful authority." That court explained that although that language "seems to imply that wiretapping would be permissible under certain circumstances, there are no statutes providing for the granting of legal authority." Id. The defendant "argue[d] that the wiretapping evidence [sought to be admitted against him] would have been inadmissible had it been obtained in Oklahoma, and that therefore it should be inadmissible without regard to where it was obtained." Id. The Frick court rejected that argument, reasoning that the "Virginia officers were in full compliance with Virginia law when they made the recording and therefore, were obtained with legal authority." Id.
In Commonwealth v. Bennett, 245 Pa.Super. 457, 369 A.2d 493, 499 (1976), that court acknowledged that the wiretapping evidence obtained in New Jersey "could not have been legally obtained under the laws of [Pennsylvania] had the wiretap occurred within [the] boundaries [of Pennsylvania]." Bennett determined that "the courts of [Pennsylvania] have absolutely no power to control the activities of a sister state or to punish conduct occurring within that sister state[,]" and the evidence was obtained lawfully under the laws of New Jersey. Id. at 460-62, 369 A.2d 493. That court did not apply the exclusionary rule approach.
[30] See People v. Blair, 25 Cal.3d 640, 159 Cal. Rptr. 818, 602 P.2d 738, 748 (1979) ("From the inception of the exclusionary rule, we have made it clear that [it] has a two-fold purpose: To deter the police from engaging in unconstitutional searches and seizures by removing their incentive to do so, and to relieve the courts from being compelled to participate in illegal conduct."); Echols v. State, 484 So.2d 568, 571 (Fla.1985) (stating that "[t]he primary purpose of the exclusionary rule is to deter future official police misconduct" and "[w]e do not believe exclusion of the evidence would have any discernible effect on police officers of other states who conduct investigations in accordance with the laws of their state and of the United States Constitution").
[31] We note that here, we are not confronted with a situation in which the evidence was obtained unlawfully under the laws of the situs jurisdiction. See Pattioay, 78 Hawai`i at 469, 896 P.2d at 925 (stating that "to ignore the violation [of the law of another jurisdiction] and allow the evidence to be admitted would be to justify the illegality and condone the receipt and use of tainted evidence in the courts of this state").
[1] I note that the majority's holding also purports to cover all evidence offered in Hawai`i, regardless of where and by whom it was obtained. Majority opinion at 1244. As explained below, in my view, the analysis changes depending upon those very important facts. Because the question before the court is a narrow question involving federal agents acting on federal property, I would constrain the holding to the facts presented and not issue a holding broad enough to include all factual scenarios.
[2] The majority opinion characterizes the Bridges case as following the conflicts of law approach. Majority opinion at 1237. This is mistaken. Bridges explicitly rejects the conflicts of law test, and does not consider the test's factors other than the situs jurisdiction. For support, the majority cites Friesen, State Constitutional Law, § 11-3(d)(3) n. 85.1 (2d ed. Supp. 1999), which describes Bridges as a conflicts of law case. It is accurate to so describe the case in the broader sense, since the question presented required the court to choose between Hawai`i and California law, but it is inaccurate to describe our approach as the conflict of law approach.

The majority also states that the Bridges decision "considered only the law and constitution of the situs jurisdiction, reflecting a conflicts of law approach that was expressly rejected." Majority opinion at 1243. Respectfully, I believe this to be a mistaken characterization. In Bridges the court employed Hawai`i law in articulating the three factors behind the exclusionary rule analysis, and then looked to Hawai`i law to elaborate on the meaning of those factors. In the analysis of that case, we determined that Hawai`i law was not offended by admitting the evidence.
[3] See D'Antorio v. State, 837 P.2d 727, 731 (Alaska App.1992)(applying Ohio law to evidence obtained in Ohio but admitted to Alaska court); People v. Blair, 25 Cal.3d 640, 656, 159 Cal.Rptr. 818, 602 P.2d 738, 748 (1979)(admitting evidence legally obtained under Pennsylvania law in Pennsylvania though it would have been suppressed had it been obtained in California); Echols v. State, 484 So.2d 568, 571-72 (Fla.1985)(examining evidence obtained in Indiana by Indiana law for admission into Florida court); State v. Engel, 249 N.J.Super. 336, 592 A.2d 572, 588 (N.J.Super.Ct.App.Div.1991)(applying New York standards for evidence obtained in New York but admitted in New Jersey); Frick v. State, 634 P.2d 738, 741 (Okla.Crim.App.1981)(Oklahoma court admits evidence obtained in Virginia because it was legally obtained under Virginia law); Commonwealth v. Bennett, 245 Pa.Super. 457, 369 A.2d 493, 494-95 (1976)(applying New Jersey law for evidence obtained in New Jersey but admitted in Pennsylvania courts).
[4] See United States v. Barragan, 589 F.Supp.2d 1012, 1015 (S.D.Ind.2008); United States v. Ozuna, 129 F.Supp.2d 1345, 1352 (S.D.Fla.2001); and United States v. Longo, 70 F.Supp.2d 225, 261 (W.D.N.Y.1999); United States v. Restrepo, 890 F.Supp. 180, 191 (E.D.N.Y.1995); and United States v. Ferrara, 771 F.Supp. 1266, 1302 (D.Mass.1991).
[5] More specifically, the ICA observed that "there was a sign posted in front of Makalapa Gate entrance . . . that warned visitors that they were entering `U.S. NAVY PROPERTY' and that `AUTHORIZED PERSONNEL ONLY' were welcome." Torres, 122 Hawai`i at 15, 222 P.3d at 422. The sign also read:

AUTHORIZED ENTRY ONTO THIS INSTALLATION CONSTITUTES CONSENT TO SEARCH OF PERSONNEL AND THE PROPERTY UNDER THEIR CONTROL. INTERNAL SECURITY ACT OF 1950 SECTION 21; 50 U.S.C. 797
The sign was posted on a fence approximately fifty feet from the guard shack. A person reading the sign would have already turned onto [Pearl Harbor Naval Base], but the guard at the guard shack would allow a person to turn around if he or she chose not to enter [Pearl Harbor Naval Base] after reading the sign. Torres had worked at the Makalapa Gate prior to May 1, 1992, and was familiar with the sign. Id. at 15-16, 222 P.3d at 422-23.